**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PLANNED PARENTHOOD OF THE BLUE
RIDGE; HERBERT C. JONES, JR., M.D.;
PLANNED PARENTHOOD OF
METROPOLITAN WASHINGTON;
VIRGINIA LEAGUE FOR PLANNED
PARENTHOOD; HILLCREST CLINIC;
RICHMOND MEDICAL CENTER FOR
WOMEN; THOMAS GRESINGER, M.D.;
COMMONWEALTH WOMEN'S CLINIC;
PLANNED PARENTHOOD OF

SOUTHEASTERN VIRGINIA,
<u>Plaintiffs-Appellees,</u>

v.

No. 97-1853

JAMES L. CAMBLOS, in his official
capacity as Commonwealth's
Attorney for the County of
Albemarle, and as a representative
of all the Commonwealth's
Attorneys in Virginia,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.

James C. Turk, District Judge.
(CA-97-43-C)

Argued: March 3, 1998

Decided: August 20, 1998

Before WILKINSON, Chief Judge, and WIDENER, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Luttig wrote the opinion, in which Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, and Williams joined. Chief Judge Wilkinson wrote a concurring opinion. Judge Widener wrote a concurring opinion. Judge Michael wrote an opinion concurring in the judgment, in which Judges Murnaghan, Ervin, and Motz joined.

_____

**COUNSEL**

**ARGUED:** William Henry Hurd, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Simon Heller, THE CENTER FOR REPRODUCTIVE LAW & POLICY, New York, New York, for Appellees. **ON BRIEF:** Richard Cullen, Attorney General of Virginia, Claude A. Allen, Deputy Attorney General, Siran S. Faulders, Senior Assistant Attorney General, Garland L. Bigley, Assistant Attorney General, Alison P. Landry, Assistant Attorney General, Brian M. McCormick, Assistant Attorney General, Daniel J. Poynor, Assistant Attorney General, Rita R. Woltz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Karen A. Raschke, MACAULAY, LEE & POWELL, Richmond, Virginia, for Appellees.

_____

**OPINION**

LUTTIG, Circuit Judge:

Following eighteen years of public debate among the citizens of the Commonwealth of Virginia, the General Assembly of the Commonwealth enacted, and the Governor of the Commonwealth signed into law, the state's Parental Notice Act, which requires that a minor who decides to have an abortion inform one of her parents twenty-four

2

hours prior to performance of the procedure. Only hours before this law was to become effective, the federal district court for the Western District of Virginia enjoined enforcement of the Act by the Commonwealth. Upon extraordinary motion of Virginia's Attorney General, we immediately stayed the district court's injunction, and allowed the law to become effective in accordance with its terms.

We hold today that the Commonwealth's parental notice statute, as legislation that respects the fundamental interests of responsible parents in the rearing and in the educational, moral, and religious development of their children, without unduly burdening the fundamental abortion right, is facially constitutional under the Fourteenth Amendment. A contrary holding -- that the People of Virginia are <u>forbidden</u> by the Constitution of the United States from requiring that the responsible mother and father of a pregnant teenage daughter even be told of the life-defining decision their own daughter confronts -- we are convinced, would be a holding not of law, but of will, and thus would betray the trust upon which our very legitimacy as an institution depends.

I.

Virginia's Governor Allen signed into law the Commonwealth's Parental Notice Act, Va. Code § 16.1-241(V), on March 22, 1997. The Virginia General Assembly had passed the measure a month earlier. By its terms, the Act was to become effective at 12:01 Tuesday morning, July 1, 1997.

As the title denotes, the Act is a parental <u>notice</u> statute, not a parental <u>consent</u> statute; it prohibits a physician from performing an abortion on an unemancipated minor unless, twenty-four hours in advance of the procedure, notice of the anticipated abortion is provided to one of the minor's parents, to a duly appointed legal guardian or custodian of the minor, or to one standing <u>in loco parentis</u> to the minor.

The Act expressly allows the performance of abortions without notice in circumstances in which the minor seeking the abortion has been the victim of parental abuse or neglect, and in circumstances in which either an abortion is immediately necessary to prevent the

3

mother's death or there is insufficient time to permit notification without exposing the minor to serious health risk.

Although the Supreme Court has never held that a parental notification law must include a judicial bypass procedure in order to withstand constitutional challenge, the Parental Notice Act includes such a procedure. That procedure permits, if it does not require, authorization of an abortion without parental notification for a minor who shows that she is mature and capable of giving informed consent, and it requires such authorization for an immature minor, and at least the abused mature minor as well, as to whom it is determined that an abortion would be in her best interest.

The Act confers upon every minor who avails herself of the bypass procedure the right to participate in the court proceedings on her own behalf and to have counsel assist her throughout the proceedings. If the minor so requests, the court is obligated to appoint counsel for the purpose of assisting the young woman in the bypass proceedings.

The Act also provides that bypass proceedings, which are to be conducted before the Commonwealth's Juvenile and Domestic Relations District Court, "shall be confidential." And the statute further provides both that judicial bypass proceedings "shall be given precedence over other pending matters so that the court may reach a decision promptly and without delay in order to serve the best interests of the minor" and that bypass petitions "shall be heard as soon as practicable but in no event later than four days after the petition [seeking judicial authorization] is filed." Finally, the Act provides any minor for whom judicial bypass of notification is denied "an expedited confidential appeal to the circuit court."

Notwithstanding the Commonwealth's inclusion of a judicial bypass procedure in its Parental Notice Act, and of the other aforementioned safeguards, the Federal District Court for the Western District of Virginia, on the eve of the Act's effective date, preliminarily enjoined enforcement of the Act by the Commonwealth, holding that a substantial probability exists that the Act is facially unconstitutional. See District Court's Memorandum Op. at 7-8.

At 4:00 p.m. that afternoon, following issuance of the district court's order and the district court's subsequent denial of the Com-

4

monwealth's motion for stay of its decision, the Commonwealth filed a motion with a single Circuit Judge to stay the district court's injunction, and, at 7:45 p.m. that night, the judgment of the district court was stayed pending appeal. See Planned Parenthood v. Camblos, 116 F.3d 707 (4th Cir. 1997). The stay was thereafter affirmed by the en banc court, see Planned Parenthood v. Camblos, 125 F.3d 884 (4th Cir. 1997), and the full en banc court subsequently heard oral argument in the matter on March 3, 1998.

II.

In enjoining Virginia's Parental Notice Act, the district court relied entirely upon the Supreme Court's decision in Bellotti v. Baird, 443 U.S. 622 (1979) (Bellotti II), reasoning that, in that decision, the Supreme Court had set forth the constitutional standards applicable to state parental notification statutes, not merely parental consent statutes. Thus, said the district court, "[t]his court will . . . apply [Planned Parenthood v.] Casey, [505 U.S. 833 (1992)] and Bellotti II to the case at bar. Bellotti II requires that a judicial bypass satisfy four criteria." Memorandum Op. at 9 (footnote and citation omitted). And the court went on to examine the judicial bypass provisions of Virginia's parental notification statute under the criteria identified by the Court in Bellotti II as essential in order for a judicial bypass procedure within a parental consent statute to satisfy the Constitution.

Specifically, the district court observed that the Supreme Court in Bellotti II held that "[i]f [a pregnant minor] satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent." Memorandum Op. at 10 (quoting Bellotti II, 443 U.S. at 647 (op. of Powell, J.) (emphasis added by district court)). The court then contrasted this requirement with the relevant provision of the Commonwealth's Act, which provides that, "[a]fter a hearing, a judge may authorize a physician to perform an abortion upon finding that the minor is mature and capable of giving informed consent to the proposed abortion." Id. (quoting Va. Code § 16.1-241 (V) (emphasis added by district court)). Concluding that the Virginia statute confers upon the judicial officer the absolute discretion whether to authorize a physician to perform an abortion without notice on a minor whom the court has determined is mature, the

5

district court held that "[t]his discretion violates the Bellotti II rule for `mature' minors." Memorandum Op. at 11.

As discussed more fully below, although the Supreme Court held in Bellotti II that parental consent statutes must include specified judicial bypass procedures, including mandatory judicial bypass for mature minors, the Court did not address what, if any, such procedures are necessary in the context of a parental notice statute, like that enacted by the Commonwealth. And although the Supreme Court has subsequently upheld parental notice statutes which included Bellotti II-style bypass procedures, see Lambert v. Wicklund, 117 S. Ct. 1169 (1997) (per curiam); Ohio v. Akron Center for Reproductive Health, 497 U.S. 502 (1990) (Akron II); Hodgson v. Minnesota, 497 U.S. 417 (1990), the Court has always carefully distinguished such statutes from parental consent statutes, explicitly reserving the question of what, if any, bypass procedures are required for parental notice statutes, see, e.g., Lambert, 117 S. Ct. at 1171-72; Akron II, 497 U.S. at 510-11; see discussion infra.

In concluding that the Supreme Court has held that a parental notification statute must meet the very same requirements that obtain for a parental consent statute, the district court seems to have confused the question of the standard of review applicable in facial challenges to abortion statutes and the question of the substantive requirements that a state's judicial bypass must satisfy if it is to meet constitutional standards. It appears that the district court conflated these two distinct questions because of its misreading of the Eighth Circuit's decision in Planned Parenthood v. Miller, 63 F.3d 1452 (8th Cir. 1995), as equating the two separate questions. Thus, for example, and most tellingly, the district court stated that,

> [i]n [Miller], the Eighth Circuit considered whether Bellotti II or [United States v.] Salerno, [481 U.S. 739 (1987),] applied to a parental notification statute. The court concluded that "the [Supreme] Court [in Casey, 505 U.S. at 833,] effectively overruled Salerno for facial challenges to abortion statutes" and went on to apply the Bellotti II standard. Significantly, the Supreme Court denied certiorari of Miller.

6

Memorandum Op. at 8 (citations omitted); see also id. (stating that plaintiffs argue that "Casey left intact the Bellotti v. Baird standard of review for judicial bypass provisions in parental consent statutes" (citations omitted)). The Eighth Circuit in Miller, however, did not reason or hold as the district court believed. That court first decided that the standard of review articulated in Casey , rather than that in Salerno, applies to facial challenges to abortion statutes and then, separately, concluded that a Bellotti II-type bypass procedure is required if a parental notification statute is to be upheld as constitutional. As that court framed the standard of review issue before it:

> The critical issue in this case is a threshold one: what is the standard for a challenge to the facial constitutionality of an abortion law? The State would have us apply the test set out in United States v. Salerno, 481 U.S. 739 (1987), under which "the challenger must establish that no set of circumstances exists under which the Act would be valid." Salerno, 481 U.S. at 745. Planned Parenthood, on the other hand, contends that the Supreme Court replaced the Salerno test in Casey, 112 S. Ct. 2791. Under Casey, it claims, an abortion law is unconstitutional on its face if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 112 S. Ct. at 2830.

Miller, 63 F.3d at 1456-57 (parallel citations omitted). Indeed, the Eighth Circuit did not even cite Bellotti II in its discussion of the appropriate standard of review. See Miller, 63 F.3d at 1456-58.

The district court compounded the error created by its misreading of Miller by misunderstanding the Supreme Court's decision in Lambert as "reinforc[ing]" its misreading of Miller. See Memorandum Op. at 9. Specifically, the district court reasoned that the Supreme Court affirmed in Lambert that Bellotti II applies in the context of parental notification statutes because the Court described the Ninth Circuit's error in that case merely as a "misapplication" of the Bellotti II standard, and not as an application of the"wrong" standard. Thus, said the district court:

> The Supreme Court reinforced the Eighth Circuit's Miller conclusion in Lambert v. Wicklund, 117 S. Ct. at 1169,

7

when it reversed a Ninth Circuit decision which held the
Montana Notice of Abortion Act unconstitutional under
Glick v. McKay, 937 F.2d 434 (1991). In its opinion, the
Court discussed the Ninth Circuit's application of the
Bellotti II standard to the Montana act and concluded that
the court had misapplied existing case law. Lambert, 117
S. Ct. at 1171. This discussion of the misapplication of the
Bellotti II standard -- as opposed to the application of the
wrong standard -- and the denial of certiorari in Miller
leads this court to conclude that the Supreme Court intends
for Casey and Bellotti II to be applied to parental notice
bypass provisions. This court will therefore apply Casey and
Bellotti II to the case at bar.

Memorandum Op. at 9 (emphases in original; footnote and citations
omitted). Contrary to the district court's belief, the Court in Lambert
said nothing whatsoever concerning the standard of review applicable
to facial challenges to abortion regulation statutes, as one would
expect given that Lambert was a summary reversal of the Ninth Cir-
cuit's decision, without even argument. Indeed, neither Salerno nor
Casey is even cited in the Court's relatively brief per curiam opinion
in Lambert.

In Lambert, the Supreme Court did, as the district court noted, dis-
cuss the Bellotti II criteria. But it did so only in demonstration that
the judicial bypass provision at issue in Lambert was "substantively
indistinguishable" from the bypass in the Ohio notice statute which
the Court sustained in Akron II on the grounds that it satisfied the
Bellotti II standards, and, therefore, that the Ninth Circuit's Lambert
decision "simply [could not] be squared with [the Supreme Court's]
decision in Akron II." 117 S. Ct. at 1171-72. The Court emphatically
did not apply Bellotti II, as the district court surmised, having con-
cluded that a parental notification statute must satisfy Bellotti II's
requirements for a bypass procedure within a parental consent statute.
In fact, in Lambert, the Court went out of its way to repeat both that
it had not held in Akron II that a parental notification statute must
include a bypass procedure and that it had held only that Ohio's
bypass provision "a fortiori . . . satisfied any criteria that might be
required for bypass provisions in parental notification statutes"
because it "satisfied the four Bellotti criteria required for bypass pro-

8

visions in parental <u>consent</u> statutes." <u>Lambert</u>, 117 S. Ct. at 1171. The Court even chided the Ninth Circuit for invalidating Nevada's parental notification statute in <u>Glick</u> v. <u>McKay</u>, 937 F.2d 434 (9th Cir. 1991), the decision as to which the Ninth Circuit concluded in <u>Lambert</u> that it was bound, "[d]espite the fact that <u>Akron II</u> involved a parental notification statute, and <u>Bellotti</u> involved a parental consent statute." <u>Lambert</u>, 117 S. Ct. at 1171. In doing so, the Court cited and quoted Justice Stevens' concurrence in the judgment in <u>Bellotti II</u> that <u>Bellotti II</u> did not determine "the constitutionality of a statute which does no more than require notice to the parents, without affording them or any other third party an absolute veto." <u>Lambert</u>, 117 S. Ct. at 1171 n.3 (citing and quoting <u>Bellotti II</u>, 443 U.S. at 654 n.1 (Stevens, J., concurring in the judgment)).

In the end, therefore, the district court correctly seemed to recognize that an issue has arisen as to whether, in <u>Casey</u>, the Supreme Court <u>sub silentio</u> overruled its decision in <u>Salerno</u> on the standard of review applicable to facial challenges to statutes regulating abortion, and therefore that a question exists as to whether the plaintiff in a facial challenge to an abortion statute must show that "no set of circumstances exists under which the Act would be valid," <u>Salerno</u>, 481 U.S. at 745, or instead must show only that "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." <u>Casey</u>, 505 U.S. at 895.**1** The district court erred, however, in reasoning from its

_____

**1 See also Janklow** v. <u>Planned Parenthood</u>, 116 S. Ct. 1582, 1583 (1996) (Stevens, J., respecting the denial of certiorari) ("<u>Salerno</u>'s rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context."); <u>id</u>. at 1585 (Scalia, J., dissenting from denial of certiorari) (noting that the Court has "sent mixed signals on the question," but affirming his belief that the Court in <u>Casey</u> did not intend to change the <u>Salerno</u> standard); <u>Fargo Women's Health Organization</u> v. <u>Schafer</u>, 507 U.S. 1013, 1014 (1993) (O'Connor, J., concurring in denial of application for stay and injunction pending appeal) ("In striking down Pennsylvania's spousal-notice provision [in <u>Casey</u>], we did not require petitioners to show that the provision would be invalid in <u>all</u> circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, `in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to

9

conclusion that the Eighth Circuit was correct in Miller that Casey overruled Salerno, that Bellotti II perforce establishes the proper standard of review for facial challenges to abortion regulation statutes and directly controls the inquiry as to the constitutionality of judicial bypass procedures within parental notification (and not just parental consent) statutes. It is plain not only that Bellotti II does neither, but also that the scope of the substantive holding of the Court in that decision will be unaffected by the final resolution of the question of whether the standard of review is that in Salerno or Casey. That is, regardless of the standard of review for facial challenges finally adopted, the Court held in Bellotti II, as we discuss below, only that a parental consent statute must include a judicial bypass procedure, and only established the procedures necessary for a consent statute.

Accordingly, the conclusion of law on which the district court's injunction to the Commonwealth rested, namely, that a parental notification statute must include a judicial bypass procedure that satisfies Bellotti II's requirements governing bypass procedures in parental consent statutes in order to be constitutional, was simply in error.

III.

We ordinarily review a district court's ruling on a preliminary injunction only for abuse of discretion, that is, only in order to determine "whether the trial court abused its discretion in finding the presence or absence of irreparable harm and a probability that the plaintiffs would succeed on the merits," Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 755 (1986). Cf. University of Texas v. Camenisch , 451 U.S. 390, 395 (1981) (stating that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits"

_____

a woman's choice to undergo an abortion.'" (emphasis in original) (citation omitted)). Compare Casey v. Planned Parenthood, 14 F.3d 848, 863 n.21 (3d Cir. 1994), with Barnes v. Moore, 970 F.2d 12, 14 & n.2 (5th Cir. 1992). Because we conclude today that the Commonwealth's parental notice statute is facially constitutional under either the Salerno or the Casey standard, we need not, and do not, decide which of these two standards applies in facial challenges to abortion statutes.

10

(emphasis added)); <u>Alabama</u> v. <u>United States</u>, 279 U.S. 229, 231 (1929) (similar). However, it is only as a prudential matter that we normally so circumscribe our review. In other words, this practice is "a rule of orderly judicial administration," <u>Thornburgh</u>, 476 U.S. at 757, and not an "inflexible" "limit on[our] judicial power," <u>id</u>. at 756-57. Where a district court's decision "rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance," <u>id</u>. at 757, we may, even on appeal from the entry of a preliminary injunction, proceed to the merits underlying the district court's judgment. For, in such cases, "[t]he customary discretion accorded to a District Court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law." <u>Id</u>. (quoting <u>American College of Obstetricians and Gynecologists</u> v. <u>Thornburgh</u>, 737 F.2d 283, 290 (3d Cir. 1984)); <u>see also Youngstown Sheet & Tube Co.</u> v. <u>Sawyer</u>, 343 U.S. 579, 585 (1952) (finding, despite the early stage of the litigation, that the case was ripe for merits review on appeal from stay of preliminary injunction).

Appellate adjudication of the underlying legal merits, on an appeal from the issuance of a preliminary injunction, is most clearly justified where not only does the injunction rest entirely upon a pure question of law, but it is plain that the plaintiff cannot prevail as a matter of the governing law. When this is apparent to the court of appeals, a defendant is, as the Supreme Court has observed for more than a century, entitled both to immediate relief and to relief from the expense of further litigation. <u>See</u>, <u>e.g.</u>, <u>Thornburgh</u>, 476 U.S. at 756 (<u>citing Smith</u> v. <u>Vulcan Iron Works</u>, 165 U.S. 518, 525 (1897)); <u>Deckert</u> v. <u>Independence Shares Corp.</u>, 311 U.S. 282, 287 (1940); <u>North Carolina Railroad Co.</u> v. <u>Story</u>, 268 U.S. 288, 292 (1925) ("By the ordinary practice in equity as administered in England and this country, an appellate court has the power on appeal from a temporary or interlocutory order or decree to examine the merits of the case if sufficiently shown by the pleadings and the record and upon deciding them in favor of the defendant to dismiss the bill and save both parties the needless expense of further prosecution of the suit."); <u>City of Denver</u> v. <u>New York Trust Co.</u>, 229 U.S. 123, 136 (1913) (explaining that the appellate power to review preliminary injunctions "is not confined to the act of granting the injunctions, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits" to the underlying claim,"and, if so, to directing

11

a final decree dismissing it"); <u>Metropolitan Water Co.</u> v. <u>Kaw Valley Drainage District</u>, 223 U.S. 519, 523 (1912) ("For, while at one time there was some difference in the rulings on that subject, it was finally settled by <u>Smith</u> v. <u>Vulcan Iron Works</u>, 165 U.S. 518, that, on appeal from a mere interlocutory order, the circuit court of appeals might direct the bill to be dismissed if it appeared that the complainant was not entitled to maintain its suit." (parallel citations omitted)).

These principles confirm the appropriateness of our proceeding to the underlying merits in this case. Here, the district court's injunction rests entirely upon that court's holding, as a matter of pure law, that a parental notice statute must include a judicial bypass in order to be constitutional and that that bypass must be identical to that required in order to sustain a parental consent statute. And the district court fundamentally erred in its resolution of these questions.

Furthermore, the facts necessary to resolve these issues are undisputed, as even the plaintiffs-appellees correctly conceded at argument. Consequently, additional proceedings in the district court would serve no purpose whatsoever. While the parties dispute the precise contours of the judicial bypass included within the Commonwealth's parental notice statute (in particular, the meaning of the maturity bypass and the scope and efficacy of its requirements for confidentiality and expeditiousness), these disputes turn upon disagreements as to the proper interpretation of the statute, and secondarily upon predictions as to how the statute will actually operate in practice -- disagreements resolvable ultimately, not through determinations of fact, but rather only through determinations of, and predictions as to, state law. Because the appellate court does not defer to the trial court on interpretations of state law, <u>see Salve Regina College</u> v. <u>Russell</u>, 499 U.S. 225, 231 (1991), and the parties have already extensively briefed, both before the district court and this court, their respective predictions as to how the statute will actually be applied, further proceedings in the district court would obviously aid neither enterprise.

Recognizing that this dispute is ripe for consideration on the merits, the parties themselves agreed at oral argument that further proceedings in the district court are not necessary and that resolution of the merits of the dispute by this court would be appropriate. Therefore, rather than extend this litigation -- which is plainly ripe for final

12

adjudication, implicates fundamental constitutional rights as determined by the Supreme Court, and has already been pending for over a year -- we proceed to the merits of plaintiffs' contention that Virginia's Parental Notice Act, on its face, violates the Fourteenth Amendment rights of minor women in the Commonwealth who choose to have abortions.

IV.

The Supreme Court held in Roe v. Wade , 410 U.S. 113 (1973), that a woman has a fundamental liberty interest in the decision whether to carry a pregnancy to term, and, in Planned Parenthood v. Casey, the Court reaffirmed that a woman has the "right`to be free from unwarranted governmental intrusion'" in making the abortion decision, 505 U.S. at 875 (joint op. of O'Connor, Kennedy, and Souter, JJ.) (quoting Eisenstadt v. Baird, 405 U.S. 438, 453 (1972)). In accordance with its recognition of this fundamental liberty interest, the Court has consistently held that the state may not permit another to exercise, in fact or in effect, an absolute, and therefore potentially arbitrary, veto over a woman's -- even a minor woman's -- decision whether to terminate her pregnancy.

Since Roe, the Court has reviewed both parental consent and parental notice statutes challenged on the grounds that they impermissibly permitted third-party veto of the abortion decision, invalidating several parental consent statutes on the grounds that they did effectively permit such veto of the abortion decisions of mature minors and minors for whom an abortion was in their best interest. The Court first addressed the constitutionality of a parental consent statute in Planned Parenthood v. Danforth, 428 U.S. 52 (1976). Because it conferred on the parent "an absolute, and possibly arbitrary, veto over the decision" of the minor and her doctor to terminate the minor's pregnancy, the Court struck down a "blanket" parental consent provision that prohibited all minors under the age of eighteen from obtaining an abortion without a parent's consent.**2** Id. at 74.

_____

**2** The Supreme Court also invalidated in Danforth a blanket provision requiring married women to obtain the consent of their husbands before obtaining abortions, because that requirement afforded husbands an absolute veto -- "exercisable for any reason whatsoever or for no reason at all" -- over their wives' abortion decisions. Id. at 71.

13

Three years later, in Bellotti II, the Court considered a parental consent statute that required a minor to obtain the consent of both of her parents or of a court before she could have an abortion. Again expressing concern over the possibility of an impermissible, absolute parental veto over the minor's abortion decision, the principal opinion of the Court held that,

> if the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained.

443 U.S. at 643 (op. of Powell, J.) (footnote omitted). The principal opinion defined the constitutional requirements for that alternative, or bypass, procedure as follows:

> A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained. In sum, the procedure must ensure that the provision requiring parental consent does not in fact amount to the "absolute, and possibly arbitrary, veto" that was found impermissible in Danforth.

Bellotti II, 443 U.S. at 643-44 (op. of Powell, J.) (footnote omitted). It then went on to invalidate the Massachusetts consent statute in question because it permitted the court to exercise an absolute veto over the abortion decision of a minor whom the court determined to be "mature and fully competent to make th[e] decision independently," id. at 651, a discretion the first of the four Bellotti II criteria forbids. See id. (op. of Powell, J., joined by Burger, C.J., and Stewart and Rehnquist, JJ.); id. at 653-56 (Stevens, J., joined by Brennan, Marshall, and Blackmun, JJ., concurring in the judgment) (concluding

14

that the statute was unconstitutional because it subjected the abortion decision of every minor -- "no matter how mature" -- to "an absolute third-party veto" by either a parent or a judge). **3**

Although the Court invalidated Massachusetts' two-parent consent statute for the reasons stated, a majority of the Court expressed that, because of the value of responsible parental involvement in the minor's abortion decision, it would have upheld the state's two-parent consent statute if that statute had included a bypass that satisfied the criteria outlined in the principal opinion:

> We are not persuaded that, as a general rule, the requirement of obtaining both parents' consent unconstitutionally burdens a minor's right to seek an abortion. The abortion decision has implications far broader than those associated with most other kinds of medical treatment. At least when the parents are together and the pregnant minor is living at home, both the father and mother have an interest-- one normally supportive -- in helping to determine the course that is in the best interests of a daughter. Consent and involvement by parents in important decisions by minors long have been recognized as protective of their immaturity.

Id. at 649 (op. of Powell, J.); see id . at 643-44; id. at 656-57 (White, J., dissenting) (noting his continuing dissent from the holding of Danforth that a state cannot require a minor to obtain the consent of her parents before undergoing an abortion). And, in Planned Parenthood v. Ashcroft, 462 U.S. 476 (1983), the Court did sustain a one-parent consent statute that included a judicial bypass that allowed the minor to obtain an abortion without consent if she proved that she was mature enough to make her own decision or that the abortion was otherwise in her best interests. See id. at 491-93. The

_____

**3** The Court confirmed the necessity of an adequate bypass procedure to parental consent requirements in Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416 (1983) ("Akron I") (overruled in part by Casey, 505 U.S. at 870, 882-85), when it struck down an Ohio parental consent statute that made no provision for a minor to make an individualized showing that she was mature enough to make her own decision, see id. at 440-41.

Court similarly upheld a one-parent consent statute in <u>Casey</u> that allowed a bypass of consent if the minor could demonstrate to the court that she "[wa]s mature and capable of giving informed consent and ha[d] in fact given her informed consent, or that an abortion would be in her best interests." 505 U.S. at 899 (joint op.); <u>id</u>. at 970-71 (Rehnquist, C.J., joined by White, Scalia, and Thomas, JJ., concurring in the judgment in part and dissenting in part) (upholding the parental consent provision).

Thus, although the Supreme Court has held that states may permissibly condition a minor's abortion even on parental consent to the procedure, it has required that parental consent statutes include <u>Bellotti II</u> judicial bypasses in order to ensure that the minor's decision is not subject to an absolute and arbitrary third-party veto. <u>See</u> <u>Casey</u>, 505 U.S. at 899 (joint op.) ("reaffirm[ing] . . . that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided that there is an adequate judicial bypass procedure").**4**

In contrast to its assessment of parental consent statutes, the Court has consistently recognized that the same potential for absolute veto over the abortion decision that inheres in a parental consent statute does not inhere in a parental notice statute, and therefore that notice statutes are fundamentally different from -- and less burdensome than -- consent statutes. As Justice Kennedy stated for four Members of the Court in <u>Hodgson</u>,

> [t]he difference between notice and consent[requirements]

_____

**4** In so holding, the joint opinion in <u>Casey</u> explicitly distinguished parental notice and consent requirements from spousal notice requirements, which the Court invalidated as unduly burdensome. <u>See</u>, <u>e.g.</u>, <u>Casey</u>, 505 U.S. at 895 (joint op.) ("[Parental notice and consent requirements], and our judgment that they are constitutional, are based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart. We cannot adopt a parallel assumption about adult women."); <u>id</u>. at 898 ("A State may not give to a man the kind of dominion over his wife that parents exercise over their children.").

16

was apparent to us before and is apparent now. Unlike parental consent laws, a law requiring parental notice does not give any third party the legal right to make the minor's decision for her, or to prevent her from obtaining an abortion should she choose to have one performed. We have acknowledged this distinction as "fundamental," and as one "substantially modify[ing] the federal constitutional challenge."

497 U.S. at 496 (Kennedy, J., joined by Rehnquist, C.J., and White and Scalia, JJ., concurring in the judgment in part and dissenting in part) (quoting Bellotti v. Baird, 428 U.S. 132, 145, 148 (1976) (Bellotti I)). And Justices Stevens and O'Connor have likewise noted that,

[a]lthough the Court has held that parents may not exercise "an absolute, and possibly arbitrary, veto" over [the abortion] decision, it has never challenged a State's reasonable judgment that the decision should be made after notification to and consultation with a parent.

Hodgson, 497 U.S. at 445 (op. of Stevens, J., joined by O'Connor, J.) (citation omitted); compare Akron II, 497 U.S. at 511 (majority) (citing H.L. v. Matheson, 450 U.S. 398, 411 n.17 (1981), for observation that "notice statutes are not equivalent to consent statutes because they do not give anyone a veto power over a minor's abortion decision"), with id. at 526 (Blackmun, J., joined by Brennan and Marshall, JJ., dissenting) ("I conclude . . . [that] a parental-notice statute is tantamount to a parental-consent statute. As a practical matter, a notification requirement will have the same deterrent effect on a pregnant minor seeking to exercise her constitutional right as does a consent statute.").

The Court has addressed the constitutionality of parental notice provisions in four cases. In the first, H.L. v. Matheson, 450 U.S. 398 (1981), it held that a state can, without providing any bypass procedure at all, constitutionally require notice to the parents of an unemancipated minor who has "made no claim or showing as to her maturity or as to her relations with her parents." Id. at 407. The Court explained that even if "the requirement of notice to parents [might]

17

inhibit some minors from seeking abortions," id. at 413, the requirement extended to "neither parents nor judges a veto power over the minor's abortion decision," id. at 411 (footnote omitted), and therefore was constitutionally permissible:

> Although we have held that a state may not constitutionally legislate a blanket, unreviewable power of parents to veto their daughter's abortion, a statute setting out a"mere requirement of parental notice" does not violate the constitutional rights of an immature, dependent minor.

Id. at 409 (footnotes omitted).

Since Matheson, the Court has twice more upheld parental notice statutes. In each of these instances, the statute included the Bellotti II bypass procedures required for consent statutes, and the Court simply sustained the statutes on the grounds that a notice statute that satisfies the requirements for a consent statute necessarily satisfies any requirements that might exist for a mere notice statute. In Akron II, the Court sustained Ohio's single-parent notification statute, which included a judicial bypass that met the Bellotti II consent bypass requirements. Akron II, 497 U.S. at 511-15. And most recently, in Lambert, the Court summarily reversed a Ninth Circuit decision which invalidated a Montana one-parent notice provision that included a Bellotti II bypass. Lambert , 117 S. Ct. at 1172; see discussion supra.

Indeed, in the twenty-five years since Roe v. Wade, the Supreme Court has invalidated only one parental notice provision -- the Minnesota two-parent notification provision at issue in Hodgson -- and that was on the narrow ground that the statute failed to provide adequate exceptions to notice in circumstances where a parent was abusive or had not assumed the responsibilities of parenthood.

The Court in Hodgson was so fractured as to render its opinions collectively all but impenetrable, with five different Justices filing opinions variously concurring and dissenting in other opinions and parts of other opinions, prompting Justice Scalia to canvass thus the Court's action in Hodgson (and in Akron II, decided the same day):

18

> One Justice holds that two-parent notification is unconstitutional (at least in the present circumstances) without judicial bypass, but constitutional with bypass; four Justices would hold that two-parent notification is constitutional with or without bypass; four Justices would hold that two-parent notification is unconstitutional with or without bypass, though the four apply two different standards; six Justices hold that one-parent notification with bypass is constitutional, though for two different sets of reasons; and three Justices would hold that one-parent notification with bypass is unconstitutional.

Hodgson, 497 U.S. at 479-80 (citations omitted) (Scalia, J., concurring in the judgment in part and dissenting in part). But at the end of the day, one majority of the Court struck down the state's two-parent notification provision without any bypass, see id. at 455 (op. of Stevens, J., for the Court), and a different majority sustained the statute with a Bellotti II bypass, which became operative in the event of the notification provision's invalidation, see Hodgson, 497 U.S. at 461 (O'Connor, J, concurring in part and concurring in the judgment in part); id. at 496 (Kennedy, J., joined by Rehnquist, C.J., and White and Scalia, JJ., concurring in the judgment in part and dissenting in part).

The specific reasoning of the individual Justices was as follows.

Four Justices, it is plain, would have upheld Minnesota's two-parent notice statute without any judicial bypass at all, reasoning that it is "permissible for a State to legislate on the premise that parents, as a general rule, are interested in their children's welfare and will act in accord with it." See id. at 485, 489-497 (Kennedy, J., joined by Rehnquist, C.J., White and Scalia, JJ., concurring in the judgment in part and dissenting in part).

Four other Members of the Court joined in an opinion written by Justice Stevens that could fairly be understood as holding that all two-parent notice statutes are per se unconstitutional because (with respect to the functioning family) they either "fail to serve any state interest" at all or fail to serve any "legitimate interest," id. at 450 (op. of Stevens, J., for the Court), and because (with respect to the dysfunctional

19

family) they actually "disserve[ ] the state interest in protecting and assisting the minor" by "prov[ing] positively harmful to the minor and her family." Id. Justice Stevens' opinion notes that the state defended the statute on the basis of its interest in having the minor make the abortion decision "only after consultation with both parents who should naturally be concerned with the child's welfare" and "in protecting the independent right of the parents `to determine and strive for what they believe to be best for their children,'" id. at 451-52 (citation omitted), and then states, without qualification, that "[n]either of these reasons can justify the two-parent notification requirement," id. at 452. Then, after surveying statutes nationwide "governing the health, welfare, and education of children" that authorized a minor to act with notice to or with the consent of a single parent or guardian, and declaring the Minnesota statute an "oddity" by comparison, id. at 454, the opinion concludes:

> These statutes provide testimony to the unreasonableness of the Minnesota two-parent notification requirement and to the ease with which the State can adopt less burdensome means to protect the minor's welfare. We therefore hold that this requirement violates the Constitution.

Id. at 455 (citations omitted); see also id. at 481 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("Today, the Court holds that a statute requiring a minor to notify both parents that she plans to have an abortion is not a permissible means of furthering the [state's interest in encouraging a minor to seek the advice of her parents when making the abortion decision.]").

It is apparent, however, that, although Justice O'Connor provided the fifth vote for the majority that invalidated the Minnesota notice statute without a bypass, she did not subscribe to the precise reasoning in Justice Stevens' opinion. In her separate opinion in which she sets forth her own reasoning for invalidating Minnesota's two-parent notice statute, Justice O'Connor contrasts the Minnesota statute with the statute in Arkansas, which, she noted, provided for exceptions to its two-parent notice requirement that would permit notice bypass in instances of abuse and permanently absent parents. See id. at 459-60 ("Subdivision 2 is the most stringent notification statute in the country. The only other State that defines the generic term `parents' as

20

`both parents' is Arkansas, and that statute provides for numerous exceptions to the two-parent notification requirement and permits bypassing notification where notification would not be in the best interests of the minor." (citations omitted)). She then identifies the specific flaws in the statute that prompted her vote to strike down the statute as first, that its exception to notification for abused or neglected minors was "less than effectual" because "in reality, [it was] a means of notifying the parents," and, second, that the statute required two-parent notice when "only half of the minors in the State of Minnesota reside with both biological parents" and "[a] third live with only one parent." Id. Justice O'Connor thus makes clear that she struck down the statute, not because a state may never require notice to both a mother and a father, but, rather, because of the "broad sweep" of Minnesota's statute in particular, and "its failure to serve the purposes asserted by the State in too many cases." Id. at 460 (O'Connor, J., concurring in part and concurring in the judgment in part); see also id. at 459 ("I agree with JUSTICE STEVENS that Minnesota has offered no sufficient justification for its interference with the family's decisionmaking processes created by subdivision 2 . . . ." (emphasis added)); id. at 479 (Scalia, J., concurring in the judgment in part and dissenting in part) (noting that he understood Justice O'Connor's opinion as holding "that two-parent notification is unconstitutional (at least in the present circumstances) without judicial bypass, but constitutional with bypass" (emphasis added)).

That this was Justice O'Connor's understanding also of Justice Stevens' opinion, and thus was the narrow grounds upon which Justice Stevens' opinion rests, is conclusively confirmed by the fact that Justice O'Connor ultimately voted to sustain the Minnesota statute, with a judicial bypass. Id. at 461 (O'Connor, J., concurring in part and concurring in the judgment in part). Obviously, if Justice O'Connor had believed that a state never has a legitimate interest in notice to both parents -- as Justice Stevens' opinion could be read to hold, and as, from his opinion in dissent, he appears to believe, see id. at 455-58 (Stevens, J., dissenting) -- she could not have sustained the provision with the bypass. In fact, the Court as a whole could not have upheld the Minnesota statute with the bypass, as it did, if five Justices had actually held that the state has no interest whatsoever in requiring that two parents be notified of their minor daughter's abortion decision. See id. at 461 (O'Connor, J., concurring in part and concurring in the

21

judgment in part) (upholding the two-parent notice statute with bypass); id. at 497 (Kennedy, J., joined by Rehnquist, C.J., and White and Scalia, JJ., concurring in part and dissenting in part). As Justice Stevens noted in his dissent, a bypass cannot save a statute that is not reasonably related to any legitimate state interest in the first place. Id. at 457.

Therefore, it is evident that the Court in Hodgson did not hold that a two-parent notice requirement is per se unconstitutional; in fact, a majority of the Court held that a two-parent notice requirement generally furthers important and legitimate state interests. It is equally evident that the Court did not hold that a parental notification statute -- even a two-parent statute -- must include a judicial bypass in order to be constitutional. As noted, Justices Kennedy, White, Rehnquist and Scalia would have sustained the statute even without the bypass and actually did (together with Justice O'Connor) sustain the statute with the bypass. Justice O'Connor voted to invalidate the statute without the bypass, but only because it failed adequately to provide exceptions to notice for the abusive parent**5** and the parent who failed to accept the responsibilities of parenthood. And she ultimately voted to uphold the statute, not because all two-parent notice statutes require a Bellotti II bypass and the modified Minnesota statute contained such a bypass, but, rather, because the statute's Bellotti II bypass necessarily cured the defects she identified in Minnesota's notice statute. See Akron II, 497 U.S. at 511 ("As we hold today in Hodgson v. Minnesota, it is a corollary to the greater intrusiveness of consent statutes that a bypass procedure that will suffice for a consent statute will suffice also for a notice statute." (citations omitted; emphasis added)).

That the Court did not strike down the statute because it lacked a
_____

**5** Although the Minnesota statute purported to include an exception to notice for abused minors, if the minor availed herself of the exception by declaring herself abused, the abuse, by law, had to be reported immediately to state authorities. The resulting investigation would result in notice to the parent. Id. at 426 n.7 (op. of Stevens, J., for the Court); see also id. at 460 (O'Connor, J., concurring in part and concurring in the judgment in part) ("The Minnesota exception to notification for minors who are victims of neglect or abuse is, in reality, a means of notifying the parents.").

22

judicial bypass, but, rather, because of the overbreadth of the statute's notice requirement, even appears upon a careful reading of Justice Stevens' opinion. As that opinion recites its holding at the beginning of its analysis: "It is equally clear that the requirement that both parents be notified, whether or not both wish to be notified or have assumed responsibility for the upbringing of the child, does not reasonably further any legitimate state interest." Hodgson, 497 U.S. at 450 (op. of Stevens, J., for the Court) (first emphasis in original; second emphasis added); see also id. at 424-25 ("No exception [to the notice requirement] is made for a divorced parent, a noncustodial parent, or a biological parent who never married or lived with the pregnant woman's mother."); id. at 445-46 (noting that biological parents' "interest in controlling the education and upbringing of their children" rises to "the level of a liberty interest" only "through the assumption of personal, financial, or custodial responsibility").

Indeed, the very same day that Hodgson was decided, the Court in Akron II, avoiding the notice bypass issue in the same way that it had in Hodgson, expressly confirmed, in an opinion in which Justice O'Connor herself joined, that it had yet to decide whether the Constitution requires that a parental notice statute include a judicial bypass:

> [A]lthough our cases have required bypass procedures for parental consent statutes, we have not decided whether parental notice statutes must contain such procedures. See Matheson, [450 U.S. at 413 & n.25] (upholding a notice statute without a bypass procedure as applied to immature dependent minors). We leave the question open, because, whether or not the Fourteenth Amendment requires notice statutes to contain bypass procedures, [the Ohio parental notice statute's] bypass procedure meets the requirements identified for parental consent statutes . . . .

Akron II, 497 U.S. at 510; see also Lambert, 117 S. Ct. at 1171 (reaffirming that, in Akron II (and therefore presumably in Hodgson as well), the Court had "declined to decide whether a parental notification statute must include some sort of bypass provision to be constitu-

23

tional"). And the question of whether a bypass is necessary within a parental notice (as opposed to consent) statute still remains open today.**6**

_____

**6** To the extent that the principal opinion in <u>Bellotti II</u> suggests that some bypass to parental notice may be required, <u>see</u>, <u>e.g.</u>, 443 U.S. at 646-48 (op. of Powell, J.), that suggestion is dicta which failed to command a majority of the Court. In fact, Justice Stevens, writing for himself and the three other Justices whose concurrence in the judgment was necessary to invalidate the parental consent provision at issue in <u>Bellotti</u>, explicitly stated that "this case [does not] determin[e] the constitutionality of a statute which does no more than require notice to the parents, without affording them or any other third party an absolute veto." <u>Id</u>. at 654 n.1 (Stevens, J., concurring in the judgment). The Court in <u>Lambert</u> even relied upon this statement by Justice Stevens in support of its conclusion that, in <u>Bellotti II</u>, it had addressed only a parental consent statute, and in affirming that whether parental notice statutes must include some sort of bypass remains an open question. <u>See Lambert</u>, 117 S. Ct. at 1171 & n.3; <u>see also Matheson</u>, 450 U.S. at 411 n.17 ("In <u>Bellotti II</u> . . . we expressly declined to equate notice requirements with consent requirements.").

Contrary to Justice Stevens' suggestion in concurrence in <u>Akron II</u>, <u>see</u> 497 U.S. at 522-23 (Stevens, J., concurring in part and concurring in the judgment), the Court in <u>Akron I</u> also did not hold that some bypass to notice -- judicial or other -- is required. The Court in <u>Akron I</u> invalidated the parental <u>consent</u> statute there at issue because it did not believe that the statute was "reasonably susceptible of being construed to create `an opportunity for case-by-case evaluations of the maturity of pregnant minors,'" <u>Akron I</u>, 462 U.S. at 441 (quoting <u>Bellotti II</u>, 443 U.S. at 643 n.23 (op. of Powell, J.)). The Court opined in a footnote that even if the general Ohio statute governing juvenile proceedings could be construed to create procedures allowing a minor to make an individualized showing of maturity, those procedures would nonetheless be inadequate to cure the constitutional infirmity of the consent requirement because, under state law, the minor's parents would receive notice if the minor availed herself of the procedures. <u>See id</u>. at 441 n.31. This footnote suggestion was obviously dicta to the Court's holding that the statute did not create a maturity bypass to its consent requirement. <u>Cf</u>. <u>id</u>. at 469 n.12 (O'Connor, J., dissenting) ("In my view, no decision of this Court has yet held that parental notification in the case of mature minors is unconstitutional.").

24

V.

Turning now to this question for the first time in our Circuit, we conclude, based upon the substantial authority from the Court emphasizing the fundamental differences between consent and notice statutes, that the Constitution does not require for "mere notice" statutes the full panoply of safeguards required by the Court in Bellotti II for parental consent statutes. In particular, we conclude that a parental notice statute that includes the exceptions to notice identified in Hodgson is, without more, facially constitutional. That is, provided that a parental notice statute does not condition the minor's access to abortion upon notice to abusive or neglectful parents, absent parents who have not assumed their parental responsibilities, or parents with similar relationships to their daughters, we do not believe that more is required in order to withstand a facial challenge to its constitutionality. For a parental notice statute -- unlike either a spousal notice or a blanket parental consent statute -- has neither "the purpose [n]or effect of placing a substantial obstacle in the path of a woman seeking an abortion," Casey, 505 U.S. at 877 (joint op.), and therefore cannot reasonably be said to unduly burden the minor's abortion right, see id.

A.

1.

A parental notice statute -- one-parent or two-parent -- that excepts from its requirements notice to the abusive or neglectful parent, or the parent who has not assumed responsibility for the minor, indisputably furthers legitimate and important state interests.

Such a notice statute serves the compelling state interest in securing inviolate the right of a mother and a father to rear their child as they see fit, and to participate fully in that child's life, as free from governmental interference as constitutionally permissible. It is a fundamental premise of our society that "[t]he child is not the mere creature of the State" and that "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for," the challenges and decisions of life. Bellotti II, 443 U.S. at 637 (op. of Powell, J.); see also Hodgson, 497 U.S. at 445 (op.

25

of Stevens, J.) (stating that as "`a counterpart of the responsibilities they have assumed[,]'" "[p]arents have an interest in controlling the education and upbringing of their children") (quoting Lehr v. Robertson, 463 U.S. 248, 257 (1983)). As the Court observed in Matheson, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." 450 U.S. at 410 (quoting Ginsberg v. New York, 390 U.S. 629, 639 (1968)); see also Bellotti II, 443 U.S. at 638 (op. of Powell, J.) ("[D]eeply rooted in our Nation's history and tradition[ ] is the belief that the parental role implies a substantial measure of authority over one's children."). And as Justice Kennedy has stated,

> [t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

Hodgson, 497 U.S. at 484 (Kennedy, J., concurring in the judgment in part and dissenting in part) (internal quotation and citation omitted).

Indeed, the parental right to shape and direct the life of one's child during that child's minority is itself a fundamental liberty interest protected by the Constitution:

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man . . . . It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.

Id. at 447 (op. of Stevens, J.) (internal quotations and citations omitted); see also Bellotti II, 443 U.S. at 639 n.18 (op. of Powell, J.) ("The Court's opinions [in] Pierce, Yoder, Prince and Ginsburg . . . all have contributed to a line of decisions suggesting the existence of a constitutional parental right against undue, adverse interference by the

26

State."); Matheson, 450 U.S. at 410 ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected." (citations omitted)); see also Hodgson, 497 U.S. at 484 (Kennedy, J., concurring in the judgment in part and dissenting in part). And this parental liberty interest is, the Court has recognized, fully consistent with the minor's liberty interest in the abortion decision. See, e.g., id. at 444 n.31 (op. of Stevens, J.) ("Properly understood . . . the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter.") (quoting Bellotti II, 443 U.S. at 638 (op. of Powell, J.)). In fact, this fundamental parental interest, derivatively asserted by the state on behalf of the parent, is at its zenith when the decision as to which parental involvement is urged is one -- like the abortion decision -- with profound and enduring consequences not merely for the physical well-being of the child, but for the child's spiritual, moral, and emotional development. See Bellotti II, 443 U.S. at 637-38, 640 (op. of Powell, J.); see also Danforth, 428 U.S. at 103 (Stevens, J., concurring in part and dissenting in part) ("[E]ven if [the abortion decision] is the most important kind of a decision a young person may ever make, that assumption merely enhances the quality of the State's interest in maximizing the probability that the decision be made correctly and with full understanding of the consequences of either alternative"); Casey, 505 U.S. at 899-900 (joint op.) (explaining that waiting period required by informed parental consent provision legitimately provided "the parent or parents of a pregnant young woman the opportunity to consult with her in private, and to discuss the consequences of her decision in the context of the values and moral or religious principles of their family"); Hodgson, 497 U.S. at 480 (Kennedy, J., concurring in the judgment in part, and dissenting in part) (describing abortion decision as a "grave" one, and observing that "a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support") (quoting Bellotti II , 443 U.S. at 641 (opinion of Powell, J.)).

Because parents do have a fundamental liberty interest in the parent to child relationship, see id. at 484 -- an interest that is not only compatible with, but also supportive of, the minor's liberty interest in her pregnancy -- the state plainly furthers a legitimate constitutional end when it affirmatively encourages continued parental involvement with

27

the minor child by requiring that mothers and fathers know of the most profound choices their children confront, see id.

As importantly, the requirement that responsible parents be apprised of their minor daughter's decision to obtain an abortion furthers the state's legitimate interest in ensuring that the minor's abortion decision is fully informed. That the states may constitutionally enact reasonable regulations to ensure informed consent, even for adult women, is beyond question. As the Court observed in Casey:

> What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. . . . Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.

505 U.S. at 877 (joint op.) (emphasis added). It was precisely because of the importance of this state interest that the Court upheld, as not "unduly burdensome" on the abortion right, Pennsylvania's informed consent provision, which permitted women to obtain abortions only after being given truthful and nonmisleading information regarding the nature of the abortion procedure. The requirement that women contemplating an abortion be provided such information, reasoned the Court, merely "facilitate[d] the wise exercise of th[e] [abortion] right." Id. at 887.

Of course, the state has an even stronger interest in ensuring that the consent of minors is informed because minors are more likely than adults to proceed uninformed. See, e.g., id. at 899 (explaining that informed consent provisions "have particular force with respect to minors"). As the Court has often recognized,"at the same time [that the teenager] is much more apt to be motivated by mere emotion or peer pressure than is an adult," she is, due to her "[i]nexperience, less education, and less intelligence . . . less able to evaluate the consequences of . . . her conduct." Hodgson, 497 U.S. at 459 (O'Connor, J., concurring in part, and concurring in the judgment in part) (quoting Thompson v. Oklahoma, 487 U.S. 815, 835 (1988)); Bellotti II, 443 U.S. at 635 (op. of Powell, J.) (noting that "minors often lack the

28

experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them" and therefore that the state validly may limit their freedom to choose). The parents, on the other hand, "possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions" and the "natural bonds of affection" lead them to act in their children's best interests. Hodgson, 497 U.S. at 495 (Kennedy, J., concurring in the judgment in part and dissenting in part) (quoting Parham v. J.R., 442 U.S. 584, 602 (1979)).

Certainly, therefore, the state may conclude that a minor's abortion decision will be more informed and better considered if her parents know of her impending decision and thus are able to assist her in making that grave decision. As Justice Kennedy has written:

> A free and enlightened society may decide that each of its members should attain a clearer, more tolerant understanding of the profound philosophic choices confronted by a woman who is considering whether to seek an abortion. . . . The State is entitled to assume that, for most of its people, the beginnings of that understanding will be within the family, society's most intimate association. It is both rational and fair for the State to conclude that, in most instances, the family will strive to give a lonely or even terrified minor advice that is both compassionate and mature. . . . It would deny all dignity to the family to say that the State cannot take this reasonable step [of requiring parental notice] to ensure that, in most cases, a young woman will receive guidance and understanding from a parent.

Akron II, 497 U.S. at 520 (op. of Kennedy, J., joined by Rehnquist, C.J., and White and Scalia, JJ.); see also Casey , 505 U.S. at 895 (majority) (noting that parental notice or consent statutes "are based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart"); Hodgson, 497 U.S. at 458 (O'Connor, J., concurring in part and concurring in the judgment in part) ("[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make

29

fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor.") (quoting Bellotti II, 443 U.S. at 640-41 (op. of Powell, J.)).

Finally, parental notice statutes serve the important state interest of ensuring that the physician advising the minor on her abortion decision has access to the child's full medical and, where relevant, psychological, history. The Court has repeatedly observed that,

> [t]he medical, emotional, and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature. An adequate medical and psychological case history is important to the physician. Parents can provide medical and psychological data, refer the physician to other sources of medical history, such as family physicians, and authorize family physicians to give relevant data.

Akron II, 497 U.S. at 519 (quoting Matheson, 450 U.S. at 411); see also id. at 518-19 ("We continue to believe that a State may require the physician himself or herself to take reasonable steps to notify a minor's parent because the parent often will provide important medical data to the physician."); cf. id. at 518 (recognizing "the superior ability of a physician to garner and use information supplied by a minor's parents upon receiving notice"). Relatedly, by ensuring that parents are informed of their child's intention to obtain an abortion, the parental notice statute also enables the parents to advise their daughter on her choice of a competent and compassionate physician, see Bellotti II, 443 U.S. at 641 n.21 (op. of Powell, J.) (noting that even "mature" 17-year olds "are less likely than adults to know or be able to recognize ethical, qualified physicians"), and to better support their daughter's physical and emotional recovery in the aftermath of the abortion, if that is the course decided upon.

In short,

> [t]here can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in

30

> making the very important decision whether or not to bear a child.

Hodgson, 497 U.S. at 445 (op. of Stevens, J.) (quoting Danforth, 428 U.S. at 91 (Stewart, J., concurring)); see also id. at 480 (Kennedy, J., concurring in the judgment in part, and dissenting in part) (same).

2.

At the same time that the state indisputably furthers legitimate purposes when it requires notice to responsible parents, the effect of such a notice requirement on the abortion right is markedly different from that of a consent requirement, as the Supreme Court has noted in every case in which it has addressed a parental notice or consent provision.

A statute that conditions a minor's access to abortions on parental consent, by definition, gives parents an absolute, and potentially arbitrary, veto over their child's decision. See Danforth, 428 U.S. at 74. Absent a judicial bypass, such a statute unmistakably places a substantial obstacle in the path of the minor who would choose abortion over childbirth. The ultimate abortion decision is, in reality, that of the parent, not that of the minor.

The effect of a mere notice provision on the abortion decision is different not merely in degree, but in kind. A parental notice statute that includes the specific exceptions constitutionally mandated by the Court in Hodgson vests with parents neither a veto in fact nor a veto in effect. As the Supreme Court has consistently recognized, the choice of whether to abort the pregnancy remains ultimately and exclusively that of the minor. See discussion supra at 16-17 (citing cases).

Nor does a parental notice requirement that excepts notice to the abusive, the irresponsible, the permanently absent, or the similarly disaffected parent, otherwise constitute a substantial obstacle to, or an undue burden on, the abortion decision. Although we appreciate well the emotional trauma that can attend a discussion between parent and child on a subject so fraught with moral, ethical, and religious impli-

31

cations as abortion, a mere notice requirement does not even necessarily force such a discussion between the minor and her parents; insofar as the law is concerned, the young woman need not even return home or otherwise establish contact with her parents following the required notice and before the abortion is performed. To be sure, if the young woman does willingly return home, or even if she only initiates telephone contact with her parents, she will almost certainly be exposed to her parents' views on the grave decision she contemplates. And, we may assume, those views may be passionately held, contrary to her own, and forcefully expressed. But the period of time between notice and abortion during which the minor may be exposed to those views is typically short (and may be shorter still, if she chooses to contact her parents only by telephone), and, during this short period, the young woman has but to listen to her parents; at least under a pure notice statute, the law does not even undertake to require consultation in the sense of a frank and open exchange between mutually receptive parent and child. And in no event need the minor conform or otherwise accommodate her plans to the desires of her parents.

We understand fully, and do not discount, the influence, if not pressure, that can be brought to bear (intentionally or not) during a discussion between parents and a child who is in the throes of a decision so emotionally wrenching as that of whether to end a pregnancy (whether the parents approve of abortion or not), even as we recognize also the tendency of teenagers in difficulty to exaggerate their parents' likely reactions to their dilemmas and to underestimate their parents' capacity for understanding and compassionate response. The opinions the parents express and the advice the parents impart will undoubtedly change the calculus of the child's decision, as properly they should. In all but the rarest of circumstances, this discussion will force the young woman, whether admittedly or not, to examine and reexamine the decision she has preliminarily made, against not only her own values, morals, and beliefs, but, where they differ, against those of her mother and her father. And, assuredly, the reaction the minor gets and the counsel she receives from her parents will, in many instances, bring about either a change of mind or a change of heart, and a consequent change in decision from that she initially reached without the benefit of her parents' experience and insight. To imagine the discussion between the concerned parents and their

32

frightened daughter is to understand the power of the dynamic to add to the burden of the imminent decision.

However, without minimizing its effect, this additional imposition on the minor's otherwise completely unfettered abortion decision cannot be said to constitute a burden that is "undue" under a Constitution that jealously protects the sanctity of the family as the cornerstone of society. For, in the end, the decision of whether to carry the pregnancy to term remains that of the minor woman alone, and no one else. And the incremental weight added to the young woman's abortion decision through the encouraged parental involvement is an incidental and inescapable consequence of the state's pursuit of its legitimate interests not only in the minor's informed consent and health, but also in preservation of the cardinal right of responsible parents to shape, as they deem appropriate, their children's lives, their beliefs, their values, their morals, their character. Just as it is in large part the absence of this latter interest which renders unconstitutional a spousal notice statute or a parental notice statute which requires notification to abusive parents or parents who have not taken responsibility for the support or upbringing of their children, so is it the presence of this interest that in substantial part renders constitutional the properly tailored parental notice statute. See , e.g., Casey, 505 U.S. at 898 (majority) (distinguishing parental notice or consent requirements from spousal notice requirements on the grounds that"[a] State may not give to a man the kind of dominion over his wife that parents exercise over their children"); Hodgson, 497 U.S. at 496 (Kennedy, J., concurring in the judgment in part and dissenting in part) (observing that notice statutes "represent[ ] a considered weighing of the competing interests of minors and their parents"); compare id. at 445-46 (op. of Stevens, J.) (noting that a natural parent's interest in "controlling the education and upbringing of their children" rises to the level of a liberty interest only through "the demonstration of commitment to the child through the assumption of personal, financial, or custodial responsibility") with id. at 450 (op. of Stevens, J., for the Court) (holding that the state has no legitimate interest in requiring notice to a parent who has not assumed such responsibility).

Indeed, to hold that the Constitution affirmatively forbids a state from requiring that mothers and fathers of pregnant teenagers merely be told of their daughters' decisions to abort their pregnancies would

33

be nothing less than an arrogation of the parental role by judicial fiat, a wresting from parents and rendering unto the courts of the privileges and responsibilities that are parenthood itself. And this, at the very moment when not only child is most in need of parent, but also, paradoxically, parent is most in need of child. Not only does the Constitution not require such an expropriation of the rights and duties of mother and father, we doubt that the People would submit to such. Even in an age of tolerance, not all is tolerable-- or to be tolerated.

B.

Accordingly, we hold today that the state may constitutionally require that mothers and fathers of teenage daughters be informed of their daughters' life-defining decisions to abort their pregnancies, provided that the state excepts from its requirement notice to abusive parents, noncustodial parents who have refused to accept their parental responsibilities, and parents with similar relationships to their children, as required by the Supreme Court's decision in Hodgson. In contrast to the full panoply of safeguards required of parental consent statutes, more is not required of the state in order for its mere notice statute to withstand facial constitutional challenge.

In particular, as to the "best interest" bypass, we hold that a notice statute that includes at least the Hodgson"best interest" exceptions for abusive or neglectful parents and parents who have otherwise refused to accept the responsibilities of parenthood, is facially constitutional, without more. While the Supreme Court might eventually require that a parental notice statute include a "best interest" bypass that would except notice in additional circumstances akin to those identified in Hodgson, we do not believe that those circumstances are likely to be sufficiently large in number that such a statute must account for them in order to withstand a facial challenge to its constitutionality. And, because a broader bypass would be in substantial tension, if not irreconcilable, with the liberty interest of parents to decide for themselves, as free as possible from governmental interference, what is and what is not in the best interests of their own children, we do not believe it likely that the Court will constitutionally require, for purposes of a facial challenge, a broader "best interest" bypass -- for example, one that would allow exceptions to notice for reasons wholly unrelated to the safety or health of the minor or to parental forfeiture of rights.

34

Such a wholesale substitution of court for parent we do not understand the Court's precedents to contemplate. See id. at 491 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("The possibility that some parents will not react with compassion and understanding upon being informed of their daughter's predicament or that, even if they are receptive, they will incorrectly advise her, does not undercut the legitimacy of the State's attempt to establish a procedure that will enhance the probability that a pregnant young woman exercise as wisely as possible her right to make the abortion decision.") (quoting Matheson, 450 U.S. at 423-24 (Stevens, J., concurring in the judgment)) (emphasis omitted); cf . Bellotti II, 443 U.S. at 648 (op. of Powell, J.) (noting that in a consent bypass proceeding the court properly should take into account that there is "an important state interest in encouraging a family rather than a judicial resolution of a minor's abortion decision" and that "parents naturally take an interest in the welfare of their children -- an interest that is particularly strong where a normal family relationship exists and where the child is living with one or both parents").

As to the "mature minor" bypass, we hold that a notice statute that is tailored so as to satisfy the requirements of Hodgson need not include, in addition, a bypass for the mature minor in order to pass constitutional muster. Cf. Akron I, 462 U.S. at 469 n.12 (O'Connor, J., joined by White and Rehnquist, JJ., dissenting) (noting that "no decision of this Court has yet held that parental notification in the case of mature minors is unconstitutional" and that in Matheson, the Court "expressly did not decide that a parental notification requirement would be unconstitutional if the state otherwise permitted mature minors to make abortion decisions free of parental or judicial `veto'" (citations omitted; first emphasis in original; second emphasis added)). We recognize that a requirement that a mature minor provide notice of her abortion to her parents -- like a requirement that an immature minor provide such notice -- will inhibit some abortions. "That a state regulation may `inhibit' abortions to some degree," however, "does not require that we find that the regulation is invalid," as Justice O'Connor has observed. Id. at 464 (citing Matheson, 450 U.S. at 413). And we are satisfied that, in the vast majority of instances, notice to parents will do no more than this, provided exceptions exist for the abusive and neglectful parent, and the parent who has otherwise refused to accept responsibility for his or her child.

35

A notice requirement does not become a veto merely because the minor has become mature enough that she must be allowed to decide for herself whether to end her pregnancy. Indeed, there is every reason to believe that the burden imposed upon the mature minor by a parental notice requirement will actually be less onerous than that imposed upon the immature minor. As Justice Stevens has noted, "[a]lmost by definition, . . . a woman intellectually and emotionally capable of making important decisions without parental assistance also should be capable of ignoring any parental disapproval." Matheson, 450 U.S. at 425 n.2 (Stevens, J., concurring in the judgment).

Moreover, that a young woman may, under law, be considered sufficiently mature that she must be allowed to make the ultimate abortion decision, does not mean that she is in fact mature or that she is mature in all respects, and it certainly does not mean that she is mature enough that the state no longer has a legitimate and substantial interest in encouraging her to seek parental counseling, guidance, and assistance with regard to the abortion decision. As the Court itself has acknowledged, "[t]here is no logical relationship between the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion." Id. at 408 (majority); see also Danforth, 428 U.S. at 75 ("[O]ur holding . . . does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy."). Thus, even the most mature teenager will benefit from the experienced advice of a parent, and, as a consequence of that dialogue, make a more informed, better considered, abortion choice. Cf. Bellotti II, 443 U.S. at 643 n.23 (op. of Powell, J.) ("[T]he fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended.").

She will be better able to select the physician who will perform the abortion, if she decides upon ending the pregnancy. See id. at 641 n.21 (noting that even 17-year olds "are less likely than adults to know or be able to recognize ethical, qualified physicians"). She will be better situated to provide her physician with the full medical history necessary to the professional treatment she will undergo. And with her parents' knowing involvement, her physical and emotional post-operative recovery will be eased.

36

Finally, it should go without saying, the parents' interest in the well-being, and continued care and support, of their minor daughter likewise does not cease upon a judicial finding that their daughter is sufficiently mature to make the abortion decision herself. As a factual matter, of course, that interest presumptively continues for life; but, even as a matter of law, that interest continues at least until the child achieves majority. Although the age of majority might be considered arbitrary, in the most important sense it is not. It represents the collective experience and insight of a society with respect not merely to the physical, but also to the emotional, development of its children and their ability to make mature decisions without parental assistance.

In sum, we find unassailable Justice Stevens' considered conclusion in Matheson, that,

> [t]he fact that certain members of the class of unmarried "minor women who are suffering unwanted pregnancies and desire to terminate the pregnancies" may actually be emancipated or sufficiently mature to make a well-reasoned abortion decision does not . . . undercut the validity of [a notification statute that requires immature and mature minors alike to provide notice of their abortion decision to their parents]. . . . [A] state legislature has constitutional power to utilize, for purposes of implementing a parental-notice requirement, a yardstick based upon the chronological age of unmarried pregnant women. That this yardstick will be imprecise or even unjust in particular cases does not render its use by a state legislature impermissible under the Federal Constitution.

Matheson, 450 U.S. at 424-25 (Stevens, J., concurring in the judgment); id. at 425 n.2 (noting that "if every minor with the wisdom of an adult has a constitutional right to be treated as an adult, a uniform minimum voting age is surely suspect").

VI.

Measured against the foregoing standards, it is evident that the Commonwealth of Virginia's parental notice statute comfortably passes constitutional muster as a facial matter.

37

A.

Initially, and quite possibly dispositively, the Commonwealth's notice provision suffers from neither of the flaws of the Minnesota notice statute at issue in <u>Hodgson</u>.

First, the Virginia parental notice statute, in contrast to the two-parent notice provision invalidated in <u>Hodgson</u>, does not require notice to absent or noncustodial parents who have not assumed significant responsibility for their children's care and upbringing. The general notice provision requires notice to "an authorized person," who, in turn, is defined as:

> (i) a parent or duly appointed legal guardian or custodian of the minor or (ii) a person standing <u>in loco parentis</u>, including, but not limited to, a grandparent or adult sibling, with whom the minor regularly and customarily resides and who has care and control of the minor.

Va. Code § 16.1-241(V). Therefore, a minor is, at most, required to notify only one parent, and, if the person who has assumed responsibility for the minor's care and upbringing is someone other than her parent, she may provide notice to that person instead. Consequently, the statute never requires a minor to notify a parent with whom she does not reside or who has not undertaken to provide for her care and well-being.

Second, the Virginia statute does not require notice to abusive parents. In fact, the statute includes an express notice exception for abused minors:

> [N]either notice nor judicial authorization shall be required if the minor declares that she is abused or neglected and the attending physician has reason to suspect that the minor may be an abused or neglected child as defined in § 63.1-248.2 [of the Virginia Code] and reports the suspected abuse or neglect in accordance with § 63.1-248.3. <u>Id</u>. § 16.1-241(V).[7]

(Text continued on page 40)

_____

[7] Moreover, the statute also provides for an abortion without notice or judicial authorization when,

38

in the attending physician's good faith medical judgment, (i) the abortion is medically necessary immediately to avert the minor's death or (ii) there is insufficient time to provide the required notice or judicial authorization because a delay would create a serious risk of substantial impairment of a major bodily function or substantial physical injury.

Va. Code § 16.1-241(V). These exceptions to the notice or judicial authorization requirements ensure that the statute's requirements will not endanger the minor's health or life.

Appellees argue for the first time on appeal that this provision of the statute is unconstitutional because it does not allow abortions without notice when delay would risk the minor's emotional health. See Appellees' Brief at 27-28, 4, 13. Even assuming that this argument has not been waived, it is meritless.

We doubt that the Court would require an emotional health exception even to an abortion regulation that banned certain abortions entirely, and Casey settles beyond doubt that a state need not provide such an exception -- to a requirement -- like the notice requirement at issue here -- that merely delays the contemplated abortion for a short period of time. The medical emergency exception to parental consent in the Pennsylvania statute upheld by the Court in Casey defined medical emergency as

> [t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

Casey, 505 U.S. at 879 (majority) (quoting 18 Pa. Cons. Stat. § 3203 (1990)). With regard to physical health, the Casey medical emergency exception to consent is, on its face, more restrictive than Virginia's medical emergency exception to notice, which does not require that the doctor conclude that delay risks "irreversible impairment" and which specifically provides for an exception to notice when delay risks "substantial physical injury," not merely "substantial impairment of a major bodily function." Moreover, with regard to emotional health, the two emergency exceptions are identical: the Casey statute, like the Virginia statute, appears on its face to make no allowance for an "emotional health" emer-

39

> Appellees do not suggest any reason why this abuse excep-
> tion is not wholly efficacious.

From our own review of the statute it appears that this abuse excep-
tion perhaps may not be sufficient in and of itself to satisfy Hodgson
because of the possibility that the provision's reporting requirement
could indirectly result in notice to the abusive parent. As we have dis-
cussed, a majority of the Court in Hodgson, and Justice O'Connor in
particular, concluded that an abuse exception is"less than effectual"
where the abuse must be reported and the resulting investigation
would provide the parent indirect notice of the minor's abortion deci-
sion. Hodgson, 497 U.S. at 460 (O'Connor, J., concurring in part and
concurring in the judgment in part).

However, even assuming that this abuse exception may be inade-
quate while standing alone,**8** the abused minor is fully protected under
(Text continued on page 42)

_____

gency. And, indeed, the Court of Appeals' construction of the Casey
medical emergency exception, to which the Supreme Court deferred, see
id. at 880, was clearly limited to "[p]hysically threatening emergencies."
Planned Parenthood v. Casey, 947 F.2d 682, 702 (3d Cir. 1991); see
also id. at 701 ("The essence of the definition . . . is that it allows a
woman and her doctors to forego many of the Act's requirements when
there is a medical emergency to the woman's physical health . . . .")
(emphasis added). Accordingly, the facial constitutionality of Virginia's
medical emergency exception cannot be disputed.
**8** It may be that the risk of indirect parental notice of the minor's abor-
tion decision and, in particular, the risk that indirect notice will occur
before the minor can carry out her decision, is significantly lower under
the Virginia statute than under the Minnesota statute at issue in Hodgson.
The Court found that the Minnesota law provided a parent who was the
subject of an investigation "a right of access to the record of the investi-
gation." Hodgson, 497 U.S. at 460 (O'Connor, J., concurring in part and
concurring in the judgment in part) (citation omitted). Presumably, the
Court was concerned that this record would include the fact that the
abuse complaint was initiated when the minor sought an abortion without
notice from a physician on the ground that she was abused.

In contrast, Virginia law apparently gives the parent "access to his own
record" only when the abuse report was determined by the social services

40

agency to be unfounded, Va. Code § 63.1-248.5:1.A., and perhaps not even then as a matter of course, see id.§ 63.1-248.5:1.C (requiring the parent to petition the court for release of the record), and gives a parent whom the agency believes or suspects abused the child access to the information used to make that determination only if such disclosure would not "endanger the well-being" of the child and is not prohibited by state or federal law, id. § 63.1-248.6:1.A. Thus, in most cases, the only information provided to the parent will be a report by the agency assessing whether the initial "report of abuse or neglect is founded or unfounded," sent within 45 days of the time that the abuse is reported. Id. § 63.1-248.6.E.7. Presumably, neither this report nor any disclosure of the investigative record to a parent suspected of abuse would detail the circumstances surrounding the initial abuse report, particularly where, as here, such disclosure would be constitutionally suspect and would con- travene, in spirit if not by terms, the confidentiality provisions of the Vir- ginia notice statute, see discussion infra, which require that the minor's decision to bypass notice be strictly confidential"[n]otwithstanding any other provision of law." Va. Code § 16.1-241(V).

Moreover, the non-judicial abuse exception in the statute invalidated in Hodgson required that the physician report the abuse within 24 hours, whereupon the state welfare agency would "immediately conduct an assessment and offer protective social services" to the minor. Hodgson, 497 U.S. at 426 n.7 (op. of Stevens, J., for the Court) (emphasis added). If the agency then interviewed the minor, it was required to notify the parent that the interview had occurred. See id . at 460 (O'Connor, J., con- curring in part and concurring in the judgment). As Justice O'Connor's opinion noted, the agency's assessment and the concomitant notice to the parent could all occur "in a time frame even before the abortion occurs." Id. (quoting Tr. of Oral Arg. at 19). In contrast, although the Virginia reporting statute advises physicians to report abuse"immediately," the physician can wait to report the abuse for up to 72 hours without penalty. See Va. Code § 63.1-248.3.B. And, unless the minor is in need of imme- diate protective care -- in which case her removal from the home will prevent the parent from obstructing her abortion decision -- the parent is apparently not entitled to notice of the investigation until the agency is required to report on its assessment of the charges within 45 days of the initial abuse report. Additionally, Virginia law does not appear to require notice to the parent even when the minor is interviewed by social services. See id. § 63.1-248.10.

41

the Virginia statute -- as under the Minnesota notice statute ulti-
mately upheld in Hodgson -- because the statute includes a manda-
tory best interest bypass which allows an abused minor to bypass
notice. The Virginia statute provides:

> After a hearing, a judge may authorize a physician to per-
> form an abortion upon finding that the minor is mature and
> capable of giving informed consent to the proposed abor-
> tion. If the judge determines that the minor is not mature,
> the judge shall, after a hearing, determine whether the per-
> formance of an abortion upon the minor without notice to
> an authorized person would be in the minor's best interest,
> and if the court finds that the abortion would be in the
> minor's best interest, it shall so authorize a physician.

Va. Code § 16.1-241(V) (emphasis added).[9] Because the courts of the

_____

Thus, in most cases, if indirect notice of the minor's abortion decision
occurs at all, it will not occur until after the minor has had the opportu-
nity to obtain an abortion. While the risk that her parent will eventually
discover her decision may make a minor more reluctant to undergo an
abortion, that effect is much more attenuated than the actual obstruction
that may result if the abusive parent learns of her decision before she
obtains the abortion.

[9] It is not entirely clear whether the statute directs the court to authorize
the abortion when the abortion is in the child's best interest or when the
abortion without notice to her parents is in the child's best interest. The
statutory language references both inquiries: it instructs the judge to con-
sider whether "an abortion upon the minor without notice to an autho-
rized person would be in the minor's best interest," but then it directs the
judge to authorize the abortion if the "court finds that the abortion would
be in the minor's best interest." Va. Code § 16.1-241(V). In any event,
the Supreme Court made clear in Lambert that any difference between
these two formulations is immaterial to the constitutionality of the stat-
ute. See Lambert, 117 S. Ct. at 1171 (noting that the Supreme Court held
in Akron II that a statute authorizing bypass if "notice is not in [the
minor's] best interests" satisfied the requirement for a best interest
bypass in Bellotti that the minor be allowed to show that the "abortion
would be in her best interests") (citations and internal quotations omit-
ted).

42

Commonwealth would be required under Hodgson, as well as by the bypass language itself, to authorize the abused minor to proceed with an abortion without notice under this best interest bypass, the abused minor's interests are protected against the contingency of indirect notice to the abusive parent or parents.[10]  Indeed, the Virginia statute's best interest bypass not only protects a minor from having to provide notice to an abusive parent, it also sweeps more broadly, guaranteeing a minor the right to bypass notice whenever she can demonstrate that her parents are likely to impede her choice contrary to her best interest. The Virginia statute thus provides safeguards well beyond those mandated by Hodgson.

It might be argued from the language of the Virginia statute that a mature minor cannot avail herself of the best interest bypass because the court is directed to consider the minor's best interest only after the court finds that the minor does not qualify for the maturity bypass. The mature minor obviously has no need for such a best inter-

_____

[10] The Court in Hodgson affirmed that such a best interest bypass adequately protects abused minors and cures the inadequacy of a statute's non-judicial abuse exception when it upheld the version of the Minnesota notice statute that included a best interest judicial bypass, even though the statute's specific abuse exception was ineffective. See Hodgson, 497 U.S. at 460-61 (O'Connor, J., concurring in part and concurring in the judgment in part) (explaining that the Minnesota notice statute passed constitutional muster with a judicial best interest bypass, even though it was unconstitutional without the bypass because of the risk that invoking the non-judicial abuse exception would result in indirect notice to the parents); id. at 492-93, 497 (Kennedy, J., joined by Rehnquist, C.J., White and Scalia, JJ., concurring in the judgment in part and dissenting in part) (concluding that the non-judicial abuse exception was alone sufficient to validate the Minnesota statute even if the risk of indirect notice to a parent deterred some minors from seeking abortions because it was reasonable "[b]eyond any question" for"the State to require that physicians report declarations of abuse to ensure that mistreatment is known to authorities responsible for the protection of minors" and that the statute was, of course, a fortiori constitutional with a best interest bypass); see also Akron II, 497 U.S. at 508, 515 (sustaining a parental notice statute with a judicial bypass for abuse that required an abused minor to prove a "pattern" of abuse by "clear and convincing evidence" before judicial bypass would be permitted).

est bypass if her maturity alone is sufficient to guarantee her the opportunity to proceed without parental notice, but appellees contend that the Virginia statute confers discretion on a court to deny a mature minor the right to bypass notice.

Even if the maturity bypass truly is discretionary as appellees contend, see discussion infra, it must be assumed that the judicial discretion to deny bypass is not unbounded, but rather must be exercised in the best interest of the minor. It would be a strange construction of the statute that would require the court to allow an immature minor to bypass parental notice when notice was not in her best interest, but that would allow the court to disregard the best interest of a mature minor simply because she is mature.[11] Thus, if the maturity bypass does prove to be discretionary, it is reasonable to assume that the discretion of the judicial officer will be constrained by the duty to act in the best interest of the child.

Moreover, because the Constitution requires that Virginia's bypass authorize an abused minor -- whether mature or immature -- to proceed without parental notice, and because the Virginia statute is reasonably susceptible of such a construction, we, as a federal court, are required by principles of federalism and comity to assume that the Virginia courts will construe the statute so as to provide a mandatory notice bypass for an abused mature minor. See , e.g., Akron I, 462 U.S. at 441 ("It is reasonable to assume . . . that a state court presented with a state statute specifically governing abortion consent procedures for pregnant minors will attempt to construe the statute consistently with constitutional requirements."); Lambert , 117 S. Ct. at 1174 (Stevens, J., joined by Ginsburg and Breyer, JJ., concurring in the judgment) (noting that the Ninth Circuit "erroneously construed the statute in a manner that caused that court to hold the statute unconstitutional" and affirming that, although the language of the Montana statute at issue was somewhat ambiguous, "it [wa]s surely appropriate to assume" a construction that obviated any constitutional concern). To

_____

[11] We do not believe that the Virginia statute purports to authorize the court arbitrarily to withhold or grant authorization to the mature minor to proceed without parental notice, and -- in this context -- any decision that would be contrary to the minor's best interest would almost certainly be arbitrary as well.

44

assume otherwise would be to ignore the clear and express require-ment of Virginia law that Virginia courts interpret state statutes so as to save them from unconstitutionality, see note 17 infra, and to invali-date prematurely on a facial challenge a state statute that the Virginia courts have yet not had an opportunity to construe.

These considerable statutory safeguards for the child's best interest confirm that Virginia's statute is plainly adapted to the legitimate pur-poses of promoting informed consent, facilitating physicians' access to relevant medical information and otherwise ensuring that minors obtain appropriate medical care, as well as to accommodating the lib-erty interests of parents in the rearing, care, and guidance of their chil-dren. They also confirm beyond question that the statute cannot possibly be understood to afford parents a veto over their child's abortion decision. The statute does not require that notice be given to parents who are abusive, or who have not assumed significant respon-sibility for their children, and thus avoids the constitutional defects of the statute struck down in Hodgson. It also includes both a broader mandatory best interest judicial bypass and, quite possibly, a manda-tory bypass for minors who are sufficiently mature that they can determine for themselves whether to end or carry their pregnancy to term.**12** See discussioninfra. Such a statute is unquestionably constitu-tional, having neither the purpose nor the effect of placing a substan-tial obstacle in the path of the minor who wishes to obtain an abortion.

B.

Even if the Commonwealth's Parental Notice Act were not consti-tutional for the reasons recited, we would still be obliged to sustain the statute as against appellees' facial challenge to its constitutional-ity. Although the Supreme Court has never held that a notice statute must include a Bellotti II bypass, the Court has repeatedly held, as we have discussed, that the constitutionality of a notice statute that does meet the Bellotti II standards is beyond question, "it [being] a corol-lary to the greater intrusiveness of consent statutes that a bypass pro-

_____

**12** As we discuss infra, there is no question at all that Virginia ade-quately ensures that its bypass proceedings are both confidential and expeditious.

45

cedure that will suffice for a consent statute will suffice also for a notice statute," Akron II, 497 U.S. at 511. Virginia courts could readily interpret the Commonwealth's parental notice statute to satisfy the Bellotti II requirements, and therefore it would be premature for us, as a federal court, to further question its facial constitutionality.

In almost every respect, the judicial bypass in the Commonwealth's statute is constitutionally indistinguishable from, and arguably more protective of the minor's abortion right than, the bypass held by the Court in Akron II to be adequate to sustain Ohio's single-parent notification statute. And, in many respects, it is also more protective of the minor's abortion right than the bypass in Hodgson, which a majority of the Court held validated the more intrusive law at issue in that case.

First, as discussed, the Virginia statute, like the Ohio statute in Akron II and the Minnesota statute upheld in Hodgson, provides for judicial bypass of the notice requirement in cases where the court finds that an abortion without notice would be in the best interests of the minor. Indeed, the Ohio statute required the minor to prove by "clear and convincing evidence" that notification was not in her best interest before bypass was allowed. Ohio Rev. Code§ 2151.85(C)(2). Obviously, this "clear and convincing evidence" standard works a greater burden on the minor's right to an abortion than does the preponderance of the evidence standard of the Virginia statute.

Second, as required in the parental consent context, the Virginia statute guarantees confidential bypass procedures. The Ohio statute in Akron II forbade the court to "notify the parents, guardian, or custodian of the complainant that she is pregnant or that she wants to have an abortion," Ohio Rev. Code § 2151.85(D), and further provided that all bypass hearings "be conducted in a manner that will preserve the anonymity" of the minor, including a requirement that "[t]he complaint and all other papers and records that pertain to an action [for judicial bypass] . . . be kept confidential and are not public records." Id. § 2151.85(F). Similarly, the Commonwealth's statute specifically provides that "[c]ourt proceedings under this subsection shall be confidential," and that "[n]otwithstanding any other provision of law, an expedited confidential appeal to the circuit court shall be available to

46

any minor for whom the court denies an order authorizing an abortion without notice." Va. Code § 16.1-241(V) (emphasis added).

Appellees argue that, when judged against the <u>Bellotti II</u> consent standards, the Virginia confidentiality guarantees are inadequate because the law only makes "proceedings" confidential and does not explicitly guarantee the confidentiality of court records. Appellees' Brief at 5, 26. However, the Chief Justice of the Virginia Supreme Court, in his role as "the administrative head of the judicial system," Va. Const. Art. VI. § 4, has issued, through the Office of the Executive Secretary of the Court, specific instructions to the judges and clerks who will handle cases under the parental notification law that they shall ensure that all records and proceedings be kept strictly confidential. The Chief Justice has imposed upon judges and clerks an obligation to adhere to the most rigorous standard of "deep confidentiality," <u>see</u> J.A. at 399-400, 433-44, and interpreted "[c]onfidentiality of the proceedings (<u>and the records of those proceedings</u>)" as "a <u>right</u> specifically guaranteed by Virginia Code § 16.1-241(V)," J.A. at 399, 433 (emphasis added).

The Virginia Supreme Court instructions also answer appellees' second objection that the confidentiality provisions will be circumvented by other sections of the Virginia juvenile code which, while guaranteeing "confidentiality" in juvenile proceedings, also provide that the court shall issue a summons "to the parents, guardian, legal custodian or other person standing <u>in loco parentis</u>, and such other persons as appear to the court to be proper or necessary parties to the proceedings." Va. Code. § 16.1-263. The instructions specifically provide that "[t]he petitioner is the only party to [the bypass] proceeding" and that "[n]o parent, guardian, custodian, or other person standing <u>in loco parentis</u> to the petitioner should be served with a notice" of the proceeding. <u>Id</u>. at 376, 395, 429. This interpretation is clearly the most logical synthesis of the Act and the background provisions governing juvenile proceedings: it would make little sense for a judge to conclude that a parent is a "proper or necessary part[y]" to a proceeding, the very purpose of which is to avoid providing that parent notice of her child's actions. Similarly, the explicit guarantees of confidentiality in the judicial bypass provision would obviously trump the general rule in juvenile proceedings that court records are open for inspection to the child's parent. <u>See</u> Va. Code § 16.1-300(A)(3). And,

47

tracking the language of the notice statute itself that confidentiality is to be maintained "[n]otwithstanding any other provision of law," id. § 16.1-241(V), the Virginia Supreme Court has instructed that "[t]he customary exceptions to confidentiality which are found in or read into Virginia Code §§ 16.1-302 and -305 are not applicable to these bypass proceedings." J.A. at 400, 434.

These imposing confidentiality protections provided for in the Virginia statute and promulgated by the Virginia Supreme Court would be adequate to sustain a consent statute, and they clearly are adequate to sustain the notice provision at issue here. Indeed, the judicial bypass to two-parent notice in Hodgson provided only that "[p]roceedings" of the court be "confidential," and did not make explicit provision for the confidentiality of court records, see Hodgson, 497 U.S. at 428 n.9 (op. of Stevens, J., for the Court) (quoting subdivision 6(c)(iii) of the Minnesota statute), and the Court readily approved that statute.

Third, Virginia's parental notice statute provides for expeditious resolution of minors' bypass petitions. Under the Ohio statute in Akron II, the trial court was required to make its decision within five business days of the filing of the minor's petition, Ohio Rev. Code § 2151.85(B)(1); the court of appeals was required to docket a minor's appeal within four days, id. § 2505.073(A); and the court of appeals was required to render a decision within five days of docketing the appeal, id. The Virginia law, by comparison, requires the court to hear the minor's bypass petition "as soon as practicable but in no event later than four days after the petition is filed," and it further provides that a minor's appeal of a denial of bypass"shall be heard and decided no later than five days after the appeal is filed." Va. Code. 16.1-241(V). Because the Virginia time frame for decision on appeal is predicated only on the date that the minor files her appeal and does not allow any delay by the court of appeals in docketing her appeal, it appears that the longest interval contemplated by the Virginia statute between a minor's filing of her petition and the resolution of any appeal may well be significantly shorter than under the Ohio statute. Thus, Virginia's bypass procedures are, if anything, likely to be more

48

expeditious than the Ohio procedures upheld by the Supreme Court in <u>Akron II</u>.**13**

Appellees contend nonetheless that the Virginia statute does not provide for sufficiently expeditious resolution of minors' bypass requests because, although it requires that petitions be <u>heard</u> by the district court within four days of filing, it does not expressly specify how quickly such petitions must be <u>decided</u>. The Virginia statute does, however, command that bypass proceedings "be given precedence over other pending matters so that the court may reach a decision promptly and without delay in order to serve the best interests of the minor." Va. Code § 16.1-241(V). Additionally, the guidance given by the Virginia Supreme Court to its lower courts clearly contemplates that, in accordance with the long established practice of Virginia's Juvenile and Domestic Relations Courts, <u>see</u> J.A. at 456, 469, the decision on the petition will usually be made at the end of the hearing held within four days of filing:

> The order granting or denying the petition should be entered <u>at the end of the hearing</u> using the form entitled ORDER IN PROCEEDING SEEKING JUDICIAL AUTHORIZATION OF ABORTION. A copy of this form is attached. The petitioner should be provided with an attested copy of the order <u>before she leaves the court</u>.

_____

**13** Moreover, one might assume from the fact that the Ohio statute's deadline for trial court decision explicitly counts only business days and not calendar days, that all of the references to"days" in the Ohio statute are to business days. Under such a reading, it could take a minor up to 22 calendar days under the statute to obtain judicial bypass of the notification requirement. Virginia's bypass provisions nowhere refer to business days, and therefore it is reasonable to assume that its expedited time frames are calculated by reference to calendar -- rather than business -- days, except perhaps when the last day of the time period falls on a Saturday, Sunday, or legal holiday, in which case the time frame may expire on the next business day. <u>See</u> Va. Code§ 1-13.3:1 (stating that when the "last day [of a time period] fixed by statute . . . falls on a Saturday, Sunday, legal holiday, or any day on which the clerk's office is closed as authorized by statute," the time frame will expire on the next business day).

J.A. at 378, 431 (emphasis added). Elsewhere in the guidance, the Virginia Court does acknowledge that the lack of a deadline for deciding the petition may allow a court to take the petition under advisement, but the court pointedly cautions that"exercising the [`advisement option'] liberally certainly conflicts with the urgency of the proceedings, as reflected in the tight statutory time frames" and that "[t]oo long a delay in adjudicating a bypass petition could have constitutional implications." J.A. at 412, 445-46. The unmistakable implication is that, whenever possible, petitions should be resolved within the statutory four-day period required for holding hearings. No more is required to sustain the statute against a facial challenge.

The bypass provision upheld by the Court in Hodgson required only that the court give precedence to bypass petitions and resolve them promptly, see Hodgson, 497 U.S. at 428 n.9 (op. of Stevens, J., for the Court) (quoting subdivision 6(c)(iii)-(iv) of the Minnesota statute, requiring the court to give the minor's petition "precedence over other pending matters so that the court may reach a decision promptly and without delay" and providing for an "expedited . . . appeal"). It did not prescribe any specific time frames in which the court had to hear or decide the minor's petition. Similarly, the one-parent consent statute upheld by the Court in Ashcroft apparently did not specify a time frame for deciding the minor's bypass petition. 462 U.S. at 479 n.4. Neither of these provisions was considered insufficient to ensure expeditious resolution of bypass requests, and we have no reason to so consider the provision before us.

Appellees contend that a judge still may flout the clear language of the statute and the cautionary instructions of the Virginia Supreme Court and withhold decision for an indefinite time after hearing a case under the Act. This argument not only inappropriately ascribes a form of lawlessness to the judges of the Commonwealth of Virginia, it is also irrelevant in the context of a facial challenge to this statute. See Akron II, 497 at 515 ("Absent a demonstrated pattern of abuse or defiance, a State may expect that its judges will follow mandated procedural requirements."). In any event, according to the state, every bypass petition heard and decided by the Virginia courts thus far has, in fact, been decided no later than the fourth day after filing. Appellant's Reply Brief at 5.

The only possibly relevant distinction between the Ohio notice statute in <u>Akron II</u>, which satisfied the <u>Bellotti II</u> consent statute requirements, and Virginia's statute, is in the maturity bypass. The Ohio statute provided that, "if the court finds, by clear and convincing evidence, that the complainant is sufficiently mature and well enough informed to decide intelligently whether to have an abortion, the court <u>shall</u> issue an order authorizing the complainant to consent to the performance or inducement of an abortion without the notification of her parents, guardian, or custodian." Ohio Rev. Code§ 2151.85(C)(1) (emphasis added). Similarly, the Minnesota statute at issue in <u>Hodgson</u> required the court to authorize the minor to obtain an abortion if the court determined that she was mature. 497 U.S. at 427 n.9 (op. of Stevens, J., for the Court) (quoting subdivision 6(c)(i)). Virginia's statute, by contrast, provides that "[a]fter a hearing, a judge <u>may</u> authorize a physician to perform an abortion upon finding that the minor is mature and capable of giving informed consent to the proposed abortion." Va. Code § 16.1-241(V) (emphasis added). Appellees argue that this distinction is crucial because Virginia's use of the term "may," rather than "shall," confirms that the Virginia maturity bypass vests discretion in the court to deny a mature minor's bypass petition, and that that discretion alone renders the Virginia statute unconstitutional on its face.

We have concluded today that the Supreme Court would not require a parental notice provision that satisfies <u>Hodgson</u> to also provide a maturity bypass, and this is especially so where, as in this case, the statute includes even a fuller best interest bypass. <u>See</u> discussion <u>supra</u>. It follows, therefore, that where the state does provide a maturity bypass, as Virginia does, we do not believe that the presence of some residual discretion in the judge to require a"mature" minor to notify her parents when such notice is in her best interest works an undue burden on a mature minor's abortion right. And it certainly cannot be said in a facial challenge either that there are no circumstances in which such an act would be valid, <u>see Salerno</u>, 481 U.S. at 745, or that the provision poses a substantial obstacle to exercise of the abortion right "in a large fraction" of cases, <u>Casey</u>, 505 U.S. at 895.**14** Thus, in our view, the Virginia courts are not constitutionally

---

**14** As discussed <u>supra</u> note 1, the circuits are split over whether the <u>Salerno</u> standard for facial challenges applies in the abortion context

51

required to construe the Commonwealth's statute so as to deprive the juvenile courts of all discretion to require mere notice to the parents of even a mature minor.

We are comfortable, however, that the Commonwealth's maturity bypass provision could reasonably be interpreted to require notice bypass for mature minors, and this would be sufficient alone to sustain the statute against appellees' facial challenge. The Virginia courts have yet to interpret the statute authoritatively, **15** but under established

_____

after Casey. See Manning v. Hunt , 119 F.3d 254, 268 n.4 (4th Cir. 1997). Although our circuit suggested in dicta in Manning that the Salerno standard remains the governing standard until the Supreme Court explicitly holds otherwise, see Manning, 119 F.3d at 268 n.4, it is unnecessary for us to resolve this question in this case, because plaintiffs cannot meet either the Salerno standard or the Casey standard.

**15** We reject appellees' contention that the Virginia Supreme Court has, in its administrative capacity, authoritatively construed the maturity bypass as discretionary. See Appellees' Brief at 7, 22. Appellees' argue that, by issuing forms for use by the juvenile courts which provide a place for the court that has found a minor mature to check either a box indicating that the petition is granted or a box indicating that the petition is denied, the Commonwealth has definitively construed the maturity bypass to be discretionary. Appellees' Brief at 7 (citing forms at J.A. 420, 454). However, these forms were not provided to the courts without explanation, as appellees' would have us believe. In fact, significantly, in written guidance distributed with the forms, the Virginia Supreme Court specifically advised its lower courts:

> The use of "may" suggests that the statute contemplates the possibility that a judge could deny the petition, despite finding that the petitioner is mature. This possibility is reflected on our form order. The language of Bellotti and its progeny raise concerns about such a disposition.

J.A. at 405, 439 (emphasis added). The materials then went on to explain the nature of the constitutional issues that would be raised by a discretionary maturity bypass. Thus, the Virginia Supreme Court did not purport to authoritatively construe the statute as authorizing a judge to exercise his discretion to deny a bypass to a mature minor. Rather, it acknowledged the existence of an important constitutional question that might arise from one possible construction of the statute and it left the resolution of the statutory construction and constitutional issues to the

52

principles of Virginia statutory interpretation, if not also as a matter of common parlance, it is clear that the word "may" can be construed as mandatory.**16** Compare Causeway Medical Suite v. Ieyoub, 109

_____

judicial process. Cf. Preface to the Virginia Supreme Court Materials, J.A. at 389 (explaining that some of the issues addressed by the materials "have no clear, definite resolution" and that the materials are intended to present the "competing arguments" on those issues).

**16** Indeed, the Commonwealth has argued in these proceedings that such a construction would be appropriate here. See  Appellant's Brief at 29-30. The Commonwealth asserts that the statutory language that a judge "may authorize a physician to perform an abortion" upon a finding of maturity can reasonably be interpreted to mean that the judge shall authorize such an abortion except where such an abortion would otherwise be prohibited by law. According to this argument, the Virginia legislature may well have chosen the permissive term "may" because the Virginia statute authorizes the abortion itself, and not merely the minor "to act without parental consultation" as in Bellotti II. Given this, using "shall" rather than "may" would have had the effect of requiring judges to authorize abortions even where they would be affirmatively prohibited by other state abortion laws, such as Virginia's strict regulations on third-trimester abortions. See Appellant's Brief at 29-30. Interestingly, recognition of this kind of problem may have underlay, even if subconsciously, the Supreme Court's own transposition of the terms "may" and "shall" in Casey itself. The Pennsylvania statute there at issue did provide, as plaintiffs contend is constitutionally required here, that if both of the minor's parents refuse consent to the abortion, the court"shall" authorize a physician to perform the abortion after a hearing in which it is determined that the minor is mature. See Casey, 505 U.S. at 905 (Appendix). Notwithstanding the statute's use of the word "shall," the Court described the bypass provision as if it were (at least according to plaintiffs' arguments) permissive:

> If neither a parent nor a guardian provides consent, a court may authorize the performance of an abortion upon a determination that the young woman is mature and capable of giving informed consent and has in fact given her informed consent .. . .

Id. at 899 (joint op.) (emphasis added). Accord Hodgson, 497 U.S. at 427 (op. of Stevens, J., for the Court) (stating that, under the Minnesota statute containing mandatory maturity and best interest bypasses, the "court can authorize" an abortion without notice when the minor is mature or when the abortion without notice is in her best interest (emphasis added)).

53

F.3d 1096 (5th Cir. 1997) (rejecting similar construction of Louisiana consent statute where state legislature had amended the existing statutory term "shall" to read "may" and governing statute required that "may" be interpreted as permissive). In fact, the Virginia Supreme Court recently interpreted the term "may" to be mandatory, despite the inclusion of the word "shall" elsewhere within that same statute. See Harper v. Virginia Department of Taxation, 462 S.E.2d 892, 895, 898 (Va. 1995). So construed, of course, the statute's bypass provisions would be indistinguishable from those found within the statutes upheld in Akron II and Hodgson, and the statute's constitutionality would be beyond dispute. See Lambert, 117 S. Ct. at 1171-72.

Given that a reasonable construction of the Commonwealth's notice statute exists by which it would satisfy even the requirements for a consent statute -- including a mandatory bypass for the mature minor -- we, as a federal court, would be most reluctant to invalidate the measure facially before the state courts have even had an opportunity to construe the statute. As the Supreme Court has often reminded, our partners in federalism deserve more by way of comity than would be implied by such a hasty invalidation of the Commonwealth's responsibly enacted legislation. See, e.g., Akron I, 462 U.S. at 468-70 (O'Connor, J., joined by White and Rehnquist, JJ., dissenting) (arguing that the majority improperly treated the consent requirement at issue as a blanket consent requirement without a best interest or maturity bypass because there was "no reason to assume that the Akron [laws] compel state judges to notify the parents of a mature minor if such notification was contrary to the minor's best interests" and "no reason to believe that the state courts would construe the consent requirement to impose any type of parental or judicial veto on the abortion decisions of mature minors").

C.

Even if we were to accept, as decided law, that a parental notice statute must meet the identical requirements that a parental consent statute must meet in order to be constitutional-- not merely that a notice statute that includes a Bellotti II bypass is a fortiori constitutional, as we do for purposes of our analysis in Part VI.B. -- the fact that the Commonwealth's statute can reasonably be interpreted to include a mandatory maturity bypass would in itself still be sufficient

54

to defeat appellees' facial challenge. For, under Virginia law, where a statute is susceptible to two interpretations, one of which would render the statute unconstitutional, the courts are required to interpret the statute so as to avoid its unconstitutionality. [17] And as a federal court reviewing such a statute -- especially a statute that has yet to be interpreted by the state courts because of federal court intervention before the statute's effective date -- we would be obliged to assume that the state courts would follow not only the state's own law, but also the Constitution. As the Supreme Court also has frequently observed in the specific context of federal court review of state abortion statutes, the federal courts, as a matter of federalism and comity, should not sustain a facial challenge to a state statute that has yet to be construed by state courts, when a reasonable construction exists which would eliminate the constitutional infirmity. See citations infra at 64, 79; see also Ashcroft, 462 U.S. at 493 (op. of Powell, J., joined by Burger, C.J.) (holding that a statute that arguably allowed the court for "good cause" to deny a mature minor the opportunity to bypass parental consent was properly construed by the court of appeals to require bypass whenever the court found the minor mature because"[w]here fairly possible, courts should construe a statute to avoid a danger of unconstitutionality"); see also Manning v. Hunt, 119 F.3d 254, 270 (4th Cir. 1997) ("The Supreme Court has ruled, in the context of challenges to abortion regulations, that federal courts should not assume lightly that a state will not comply with Supreme Court mandates."). That such a saving construction would be available and appropriate if necessary to avoid the statute's invalidation proves the error in the district court's conclusion (even on its understanding of the Constitution as requiring a mandatory maturity bypass) that, while the federal courts and the Virginia state courts are obligated to construe state statutes so as to avoid their unconstitutionality, both the federal courts and the courts of the Commonwealth would be without the authority to "re-

_____

[17] "There is a presumption that the legislature in the passage of an act did not intend to violate the constitution of the state or of the United States, and if such an act is susceptible of two constructions, one of which would make the same invalid as in violation of the state or federal constitutions and the other give validity to the act, the latter interpretation will be adopted upon the theory of legislative intent not to violate any provision of either of such instruments." 17 Michie's Jurisprudence of Virginia and West Virginia, Statutes, § 56.

55

write" what the district court characterized as the "express, carefully thought-out words of the Virginia General Assembly." Memorandum Op. at 12.

VII.

Our Constitution confers no more fundamental rights than those brought into relief by a statute requiring that the mother and father of a teenager with child be informed of the daughter's decision to terminate her pregnancy by abortion. A mother and father who assume the responsibility of the highest calling in life are entitled to the fullest possible measure of not only constitutional solicitude, but constitutional encouragement, in their sacred endeavor. They are <u>obliged</u> to know, and they are <u>entitled</u> to know, the life-defining decisions their children face. By the same token, as the Supreme Court has held and recently reaffirmed, there are few rights more fundamental than that of a woman -- even a minor -- to decide herself whether or not to carry her pregnancy to term. We conclude today, however, that these liberties are fully compatible, each with the other, when the law requires what the Supreme Court itself has repeatedly characterized as "mere notice" by the child to the parent. To hold otherwise, we are convinced, would be to turn child from parent, and parent from child -- at the very moment in life when each is most in need of the other. Such a plenary violation of family the Constitution cannot be construed to require. Were it to be so, right would be they who said that with arrogance implacable we had our foundation rent asunder.

The preliminary injunction issued by the district court was in error and is vacated. The case is remanded for entry of judgment in favor of the Commonwealth of Virginia.

<u>VACATED AND REMANDED</u>

56

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PLANNED PARENTHOOD OF THE BLUE
RIDGE; HERBERT C. JONES, JR., M.D.;
PLANNED PARENTHOOD OF
METROPOLITAN WASHINGTON;
VIRGINIA LEAGUE FOR PLANNED
PARENTHOOD; HILLCREST CLINIC;
RICHMOND MEDICAL CENTER FOR
WOMEN; THOMAS GRESINGER, M.D.;
COMMONWEALTH WOMEN'S CLINIC;
PLANNED PARENTHOOD OF

SOUTHEASTERN VIRGINIA,
<u>Plaintiffs-Appellees,</u>

v.

JAMES L. CAMBLOS, in his official
capacity as Commonwealth's
Attorney for the County of
Albemarle, and as a representative
of all the Commonwealth's
Attorneys in Virginia,
<u>Defendant-Appellant.</u>

No. 97-1853

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.

James C. Turk, District Judge.
(CA-97-43-C)

Argued: March 3, 1998

Decided: August 20, 1998

Before WILKINSON, Chief Judge, and WIDENER, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Luttig wrote the opinion, in which Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, and Williams joined. Chief Judge Wilkinson wrote a concurring opinion. Judge Widener wrote a concurring opinion. Judge Michael wrote an opinion concurring in the judgment, in which Judges Murnaghan, Ervin, and Motz joined.

_____

**COUNSEL**

**ARGUED:** William Henry Hurd, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Simon Heller, THE CENTER FOR REPRODUCTIVE LAW & POLICY, New York, New York, for Appellees. **ON BRIEF:** Richard Cullen, Attorney General of Virginia, Claude A. Allen, Deputy Attorney General, Siran S. Faulders, Senior Assistant Attorney General, Garland L. Bigley, Assistant Attorney General, Alison P. Landry, Assistant Attorney General, Brian M. McCormick, Assistant Attorney General, Daniel J. Poynor, Assistant Attorney General, Rita R. Woltz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Karen A. Raschke, MACAULAY, LEE & POWELL, Richmond, Virginia, for Appellees.

_____

WILKINSON, Chief Judge, concurring:

The great turn-of-the-century astronomer, Percival Lowell, contributed much to our knowledge of the planets and the vastness of the cosmos. Pluto is named after him, the first two letters of its name being Percival Lowell's own initials. Lowell's lifelong passion, however, was the planet Mars. See generally William G. Hoyt, Lowell and Mars (1976).

58

Working from his observatory on Mars Hill in Flagstaff, Arizona, Lowell became convinced that Mars teemed with life. The lines on the planet's surface seemed to him a vast network of canals, a huge planetary distribution system. Perhaps not surprisingly, the astronomer's theories on Mars bore an uncanny resemblance to Lowell's life on Earth, the extraterrestrial engineering feats mirroring the industrial revolution of the late nineteenth century and the Martian irrigation ditches alleviating conditions like those found in the observatory's own American Southwest. Fanned by Lowell's observations, a popular belief in a populated Mars took root. Id.

Lowell, of course, sought scientific truth, while we, as judges, go in search of legal, ethical, or philosophic certainty. Yet judges, no less than astronomers, have but a blurred, imperfect gaze upon the objects of their passions. Truth is as elusive to those learned in the law as to those versed in the stars, clouded as it is by new discovery and deep complexity.

Judges' observations need not resolve every highly-charged debate. In Hoffman v. Hunt, 126 F.3d 575 (4th Cir. 1997), this circuit properly upheld the constitutionality of the Freedom of Access to Clinic Entrances Act of 1994, in which Congress acted to prevent nationwide violence and obstruction of access at abortion facilities. See also American Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir. 1995). And today, this court sustains the constitutionality of Virginia's parental notification law. The binding principle of these decisions is not one of political philosophy, but of judicial restraint.

The astronomers of the bench do not have all the answers to such questions as: When does human life begin? Where does the role of the state in intimate decisions end? The perplexity of these questions perhaps explains why Americans remain so deeply and so passionately divided on the answers. On matters touching profound moral beliefs and intimate human freedom, a democratic system holds forth no prospect of agreement. What it does promise is a compromise that disenfranchises no one and that, though fully satisfactory to few, may be partly satisfactory to many.

The compromise reached here, the Virginia Parental Notification Act, imposes only the mildest form of regulation upon the fundamen-

59

tal constitutional right to terminate an unwanted pregnancy. Va. Code § 16.1-241(V). The Act prescribes notification, not consent, and requires informing one parent, not two. The Act contains exemptions for medical emergencies and situations where the minor has been the victim of parental abuse or neglect. And the Act allows judicial by-pass of the notification requirement both for mature minors who are capable of giving informed consent to an abortion and for any minor if an abortion without notice would be in her best interests. Though petitioners object that the Act says a court "may" rather than "must" waive notification in these circumstances, the Act is certainly suscep-tible to a construction that avoids this objection. Finally, the Act pro-vides an array of procedural safeguards: a minor seeking to avail herself of the by-pass procedure may act on her own behalf or the court may appoint a guardian ad litem; the minor shall be advised of her right to counsel and may request that counsel be appointed to rep-resent her; all proceedings pursuant to the Act are confidential; and the Act outlines an expedited schedule for hearing by-pass petitions and deciding appeals from adverse rulings. If the Act were a consent statute or otherwise imposed more onerous burdens on the abortion right, we would have a very different case.

To be sure, the legislative compromise here does not please every-one. The law does not go so far as to satisfy those who would condi-tion abortion on the giving of parental consent. And it goes too far for those who would leave the decision of whether to consult a parent solely in the hands of a minor. The procedure for bypassing parental notification may be too cumbersome for some, and it may be too porous for others. But such things inhere in the nature of compromise. Here, the compromise was reached after more than a decade of public debate. Virginia has taken a modest step to promote the consultation of parent and child in reaching the profound decision to terminate an unwanted pregnancy. This is not, as I read the Supreme Court's case law, an illegitimate exercise in democracy. So long as the core consti-tutional right is safeguarded, I understand the Court to say that demo-cratic debate, at least at the margins, may continue. For all its raucous moments, such debate may ultimately unify Americans more than the Lowellian solution of a court.

WIDENER, Circuit Judge, concurring:

I.

I concur in the result, and I concur in the majority opinion.

II.

Left to my own devices, I would arrive at the same result by a more direct route. In my opinion, under existing precedent, a Virginia court which has found an infant to be mature but has declined to authorize an abortion upon request of the infant, has abused its discretion. So the use of "may" in the Virginia statute, which has caused all the commotion here, is of no moment. Along the same line, the infant <u>may</u> have chosen the notice route, or she <u>may</u> have chosen the bypass route. Since the statute, however, contains a bypass proceedure for a mature infant, the fact that she <u>may</u> choose the notice route is a matter of indifference, and that aspect of the statute does not invalidate it.

As the Virginia statute is thus construed, our case is indistinguishable from <u>Akron II</u>.

MICHAEL, Circuit Judge, concurring in the judgment:

The Virginia Parental Notice Act requires that unmarried women under eighteen notify their parents before they can obtain an abortion. The statute contains an exception to the notice requirement, however: if a Virginia juvenile court judge finds that the minor is mature and capable of giving informed consent, the judge "may authorize a physician to perform an abortion." Va. Code § 16.1-241(V). The plaintiffs argue that this statute gives a judge discretion to force a young (minor) woman to notify her parents before she can exercise her constitutional right to obtain an abortion, even if the judge concludes that she is mature and capable of informed consent. However, if "may" means "must," the statute would meet what I believe is the constitutional requirement that a parental notice statute have a mandatory judicial bypass for mature minors.

The United States Supreme Court has never directly decided whether a parental notice statute must accord mature minors a manda-

61

tory judicial bypass. The majority takes this as an invitation to ignore the implication of the Court's clear statements that the state's interest in encouraging parental involvement in the abortion decision must give way to a mature minor's constitutional right to obtain an abortion. It then overlooks the harmful consequences (physical and psychological abuse) that will surely befall many mature minors if all are forced to tell their parents of their wish to have an abortion. These harmful consequences cannot be ignored because under Casey they must be considered in determining whether a statute poses an undue burden on the abortion right. Yet the majority refuses to recognize that a parental notice statute without a mandatory bypass brings the prospect of abuse and intimidation for a large fraction of mature young women who choose an abortion but who do not wish to notify their parents. As a result, the majority comes to the erroneous conclusion that a statute lacking a mandatory bypass would not pose an undue burden on a mature minor's right to an abortion. Because I believe the majority misreads the thrust of what the Supreme Court has said and refuses to recognize the harms that make parental notice statutes without a mandatory bypass an undue burden, I cannot join in its opinion.

However, the Virginia statute must be construed by the Virginia courts in accordance with the United States Constitution. Under Virginia law a statute that employs the word "may" will be interpreted to be mandatory rather than permissive if that is what the Constitution requires. Since the Constitution requires Virginia state judges to permit mature young women to obtain abortions without parental notice, the word "may" must be interpreted as a mandatory term. For that reason alone, I concur in the judgment that the Virginia statute is not unconstitutional on its face.

I.

I agree with the majority that the Supreme Court has never squarely held that a parental notice statute requires a mandatory judicial bypass just like a parental consent statute does. See Lambert v. Wicklund, 117 S. Ct. 1169, 1171 (1997). However, I do not understand how the majority can transform this lack of a square holding into "substantial authority" for the proposition that mature minors may be forced to notify their parents before exercising their right to

62

choose an abortion. See ante at 25. This flies in the face of twenty years of clear indications by the Court that mature minors share the same rights as adult women in exercising the abortion right. I believe there is little doubt that, if squarely presented with the issue, the Court would require a mandatory judicial bypass for mature minors.

The Supreme Court's insistence on the preservation of a mature minor's constitutional right to obtain an abortion free of parental obstacles has its origins in Bellotti v. Baird , 443 U.S. 622, 647 (1979) (Bellotti II). In Bellotti II the Court struck down a statute requiring that parents be notified of their minor daughter's desire to seek an abortion before she could obtain judicial consent, even though the Commonwealth of Massachusetts attempted to justify this requirement on the ground that it enabled the parents to argue in court that an abortion would not be in the minor's best interests. Writing for a four-Justice plurality, Justice Powell said, "[i]f [a minor] satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent ." Id. at 647 (plurality opinion) (emphasis added). While, as the majority notes, this statement did not command a majority, subsequent opinions have demonstrated the continued vitality of the statement that mature minors must be permitted to receive an abortion without parental notice. See, e.g., Hodgson v. Minnesota, 497 U.S. 417, 453-54 (1990) ("the constitutional defects that Justice Powell identified in the statute [in Bellotti II] - its failure to allow a minor who is found to be mature and fully competent to make the abortion decision independently and its requirement of parental consultation even when an abortion without notification would be in the minor's best interests-- are predicated on the assumption that the justification for any rule requiring parental involvement in the abortion decision rests entirely on the best interests of the child" (citing Bellotti II) (emphasis added, footnote deleted)).

In H.L. v. Matheson, 450 U.S. 398 (1981), the majority opinion declined to consider whether the Constitution required a mandatory judicial bypass for mature minors in a parental notice statute because the plaintiff did not argue that she was a mature minor. See id. at 406. However, Justice Powell (in a separate concurrence joined by Justice Stewart) said that "a State may not validly require notice to parents

63

in all cases, without providing an independent decisionmaker to whom a pregnant minor can have recourse if she believes that she is mature enough to make the abortion decision independently or that notification otherwise would not be in her best interest." Id. at 420 (Powell, J., concurring). In the same case Justice Marshall noted in a four-vote dissent that the Court was "not question[ing] that exceptions from a parental notice requirement are necessary . .. for minors able to demonstrate their maturity." Id. at 428 n.3 (Marshall, J., dissenting). When the votes for Justice Powell's concurrence and Justice Marshall's dissent are combined, six justices agreed that a mature minor cannot be required to notify her parents before obtaining an abortion.

This principle was explicitly approved by the Court in Akron v. Akron Center for Reproductive Health, 462 U.S. 416 (1983) (Akron I), overruled in part on other grounds by Planned Parenthood v. Casey, 505 U.S. 833, 881-83 (1992). The Court there held that a statute requiring parental notice for all minors under the age of fifteen without a case-by-case determination of whether a minor is mature is unconstitutional. The Court recognized the state's considerable interest in protecting children and encouraging parental involvement in such a weighty decision as whether to have an abortion, an interest the majority highlights in its opinion today. Nevertheless, the Court indicated that "these state and parental interests must give way to the constitutional right of a mature minor" to obtain an abortion. Id. at 428 n.10 (citing Justice Powell's concurrence and Justice Marshall's dissent in Matheson) (emphasis added).

I agree with the majority that a minor child's parents have a major interest in guiding the child's decisions, particularly on the important choices surrounding the matter of abortion. In Planned Parenthood v. Casey, 505 U.S. 833, 895 (1992), the Court recognized that it had upheld some parental notice or consent statutes as constitutional "on the quite reasonable assumption" that minors benefit from consultation with their parents.[1] On this point the Court referred to its prior

_____

[1] A study reported in our record reveals that "in states without parental involvement laws in effect, the majority of unmarried minors having an abortion (61%) said that one or both of their parents knew about their abortion. Of the parent who knew about the pregnancy, 75% had been told by the daughter herself." In the majority of cases, therefore, notice occurs, and positive parental guidance can follow, without intervention by the state.

64

decisions in <u>Ohio v. Akron Center for Reproduction Health</u>, 497 U.S. 502 (1990) (<u>Akron II</u>), <u>Bellotti II</u>, and <u>Planned Parenthood v. Danforth</u>, 428 U.S. 52, 74 (1976). <u>See Casey</u>, 505 U.S. at 895. Those decisions approved only those statutes that permitted <u>mature</u> minors to opt out of the parental notice or consent provision through a <u>mandatory</u> judicial bypass. <u>See, e.g.</u>, <u>Akron II</u>, 497 U.S. at 510-12 (upholding parental notice statute because it contained a mandatory judicial bypass for mature minors). This is consistent with the Court's prior statement in <u>Akron I</u> that a <u>mature</u> minor's constitutional right to an abortion outweighs the interests of the state and parents to require that the minor notify her parents about a planned abortion.

The Court's statements in these cases make clear that once a minor is found to be mature and capable of making an informed choice, she must be given the same consideration as an adult woman when it comes to her constitutional rights. <u>See Bellotti II</u>, 443 U.S. at 647 (plurality opinion); <u>Akron I</u>, 462 U.S. at 428 n.10; <u>Hodgson</u>, 497 U.S. at 453-54. Thus, the state cannot impose any restrictions on a mature minor's right to choose an abortion that cannot be imposed on an adult woman. <u>See Planned Parenthood v. Miller</u>, 63 F.3d 1452, 1460 (8th Cir. 1995) (Arnold, C.J.), <u>cert. denied sub nom. Janklow v. Planned Parenthood</u>, 517 U.S. 1174 (1996); <u>see also Causeway Medical Suite v. Ieyoub</u>, 123 F.3d 849, 851 n.3 (5th Cir. 1997) (Jones, J., dissenting from denial of reh'g en banc) (Under <u>Bellotti II</u> "[i]f the court finds [a young woman] sufficiently mature to make the abortion decision, that is the end of the matter. Neither the court nor the parents can tell her what to do"). Until today, this principle has led <u>every</u> circuit considering the issue to conclude that any statute which forbids mature minors from obtaining abortions without parental notice is unconstitutional unless it provides a <u>mandatory</u> judicial bypass. <u>See, e.g.</u>, <u>Causeway Medical Suite v. Ieyoub</u>, 109 F.3d 1096, 1104-06 (5th Cir. 1996), <u>reh'g en banc denied</u> 123 F.3d 849 (5th Cir.), <u>cert</u>. <u>denied</u>, 118 S. Ct. 357 (1997); <u>Miller</u>, 63 F.3d at 1459-61; <u>Zbaraz v. Hartigan</u>, 763 F.2d 1532, 1536 (7th Cir. 1985), <u>aff'd by an equally divided court</u>, 484 U.S. 171 (1987); <u>Indiana Planned Parenthood Affiliate Assoc. v. Pearson</u>, 716 F.2d 1127, 1134 (7th Cir. 1983) (A parental notice statute "constitutionally cannot . . . give the juvenile court the authority to refuse to waive notification despite a finding that the minor is mature"). Against this background, I cannot agree with the majority's conclusion that the Constitution allows a state to

forbid mature minors from exercising their right to an abortion unless they first notify their parents.

II.

In evaluating the constitutionality of the Virginia Parental Notice Act, the majority purports to apply the Supreme Court's test in Casey. Under this test if a statute restricting abortion has "the effect of placing a substantial obstacle in the path of a woman's choice," it is invalid on its face. In its analysis the majority only considers one possible effect of a statute that forces mature minors to notify their parents before having an abortion: that the minors may be "exposed to [their] parents' views" on the abortion decision. Ante at 32. Unsurprisingly, the majority finds this effect not to be a substantial obstacle to the rights of mature minors, and it concludes that the Virginia statute is constitutional.

The majority's analysis slights the real and very serious consequences that a requirement of parental notification without a mandatory judicial bypass would have for many mature young women who have very good reasons to avoid parental notice. These reasons include the fear and prospect of physical and psychological abuse by parents. The Supreme Court has held in the spousal notification context that these fears have the unconstitutional effect of placing a substantial obstacle in the path of a woman's right to choose abortion. Because many mature minor women would reasonably have similar fears of abuse under a parental notification statute without a mandatory judicial bypass, such a statute is also unconstitutional.

A.

In Casey the Supreme Court established a clear test for determining whether a statute restricting abortion could survive constitutional scrutiny. A statute is invalid on its face if it places an undue burden on a woman's right to have an abortion. An undue burden exists if the state regulation has "the effect of placing a substantial obstacle in the path of a woman's choice" to obtain an abortion. Casey, 505 U.S. at 877 (joint op. of O'Connor, Kennedy, and Souter, JJ.). A statute that creates a substantial obstacle for a large fraction of those women

66

affected by the regulation creates an undue burden and is facially unconstitutional. See id. at 894-95.**2**

_____

**2** The majority seems to have some doubt about whether the "undue burden" standard used by the Court in Casey  is the proper standard for facial challenges to abortion regulations, a doubt our court first articulated in dicta in Manning v. Hunt, 119 F.3d 254, 268 n.4 (4th Cir. 1997). The focus of the controversy hinges on whether the Casey "undue burden" test overruled United States v. Salerno , 481 U.S. 739 (1987), which indicated that a facial challenge must "establish that no set of circumstances exists under which the Act would be valid." Id. at 745.

I harbor no such doubts. Casey is clear on its face that the Court "set forth a standard of general applicability" for reviewing facial challenges to abortion restrictions. Casey, 505 U.S. at 876; see also Fargo Women's Health Org. v. Schafer, 507 U.S. 1013, 1014 (1993) (O'Connor, J., concurring in denial of application for stay and injunction pending appeal) ("In striking down Pennsylvania's spousal-notice provision [in Casey], we did not require petitioners to show that the provision would be invalid in all circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, `in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" (emphasis and second alteration in original) (citation omitted)); cf. Janklow v. Panned Parenthood, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting the denial of certiorari) ("Salerno's rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context."); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 271-79 (1994) (noting that even before Casey, Supreme Court did not apply Salerno  standard in the abortion context). I would therefore join the overwhelming majority of our sister circuits in accepting that the Casey undue burden test must be applied in facial challenges to abortion restrictions. See, e.g., Women's Medical Professional Corp. v. Voinovich, 130 F.3d 187 (6th Cir. 1997), cert. denied, 118 S. Ct. 1347 (1998); Jane L. v. Bangerter, 102 F.3d 1112 (10th Cir. 1996), cert. denied, 117 S. Ct. 2453 (1997); Planned Parenthood v. Miller, 63 F.3d 1452 (8th Cir. 1995) (Arnold, C.J.), cert. denied sub nom. Janklow v. Planned Parenthood, 517 U.S. 1174 (1996); Casey v. Planned Parenthood, 14 F.3d 848 (3d Cir. 1994) (on remand), stay denied sub nom. Casey v. Planned Parenthood, 510 U.S. 1309 (Souter, Circuit Justice 1994); Wicklund v. Lambert, 979 F. Supp. 1285 (D. Mont. 1997) (on remand) (citing Compassion in Dying v. Washington, 79 F.2d 790, 798 n.9 (9th Cir. 1996) (en banc), rev'd on other grounds sub nom. Washington v. Glucksberg, 117 S. Ct. 2258 (1997)).

In Casey the Court evaluated the constitutionality of a Pennsylvania statutory provision that required spousal notification before a married woman could obtain an abortion. The Court focused its analysis on the effects of the provision on "married women selecting abortions who do not wish to notify their husbands." Id. at 895. Relying on extensive factfinding by the district court, the Court concluded that several factors would tend to dissuade a large fraction of this class of women from seeking abortions even if they were legally entitled to one. These factors included the very real and tragic possibility of physical abuse. The Court noted that there is considerable undisputed evidence that violence against wives by their husbands is all too prevalent, affecting thousands of women every day . It further recognized that "[m]ere notification of pregnancy is frequently a flashpoint for battering and violence within the family. The number of battering incidents is high during pregnancy and often the worst abuse can be associated with pregnancy." Id. at 889 (citation and internal quotations omitted).

The Casey Court also considered evidence of non-physical abuse or coercion that could prevent women from seeking an abortion. The Court observed:

> Many [women] may fear devastating forms of psychological abuse from their husbands, including verbal harassment, threats of future violence, the destruction of possessions, physical confinement to the home, the withdrawal of financial support, or the disclosure of the abortion to family and friends. These methods of psychological abuse may act as

---

I must also note that even the Fifth Circuit, the sole court to reject Casey and follow Salerno, has determined that a parental notice statute must include a mandatory judicial bypass for mature minors in order to survive a facial constitutional challenge. See Causeway Medical Suite v. Ieyoub, 109 F.3d 1096, 1104 (5th Cir. 1996), reh'g en banc denied 123 F.3d 849 (5th Cir.), cert. denied, 118 S. Ct. 357 (1997).

At any rate, the majority claims that even under the Casey test, the Virginia statute is facially valid. Accordingly, I proceed by challenging this conclusion under Casey.

even more of a deterrent to notification than the possibility of physical violence, but women who are the victims of the abuse are not exempt from [the] notification requirement.

Id. at 894. The Court ultimately concluded that because of the danger of physical and psychological abuse facing a large fraction of married women who do not wish to notify their husbands about a planned abortion, a spousal notice statute posed the same undue burden on women as a statute giving the husband veto power over his wife's decision to have an abortion.

Whether the prospect of notification itself deters such women from seeking abortions, or whether the husband, through physical force or psychological pressure or economic coercion, prevents his wife from obtaining an abortion until it is too late, the notice requirement will often be tantamount to the veto found unconstitutional in Danforth. The women most affected by this law -- those who most reasonably fear the consequences of notifying their husbands that they are pregnant -- are in the gravest danger.

Id. at 897. The court accordingly struck down the spousal notice provision as facially unconstitutional. See id.

B.

As I have said, the majority purports to apply the Casey "undue burden" standard in considering whether the Virginia parental notice statute passes constitutional muster. See ante at 25. But instead of addressing the real effects of a mandatory parental notice statute, the majority builds a man of straw which it finds easy to knock down. The only possible effect of parental notice that the majority even considers is that the minor "may be exposed to her parents' views" on the abortion decision. Ante at 32. By suggesting only such a minor burden, the majority is able to dismiss it with ease by asserting that parents have the right to guide their children through moral suasion.

The majority's argument fails to acknowledge the serious effects that parental notice of an abortion has for many young women under

69

eighteen. It does not address the evidence in the record that a very real danger of physical and psychological abuse exists for a large fraction of those young women who would be forced (against their will) to notify their parents that they are pregnant and considering an abortion. These dangers are not only virtually identical to those which caused the Supreme Court to invalidate a spousal notification provision in Casey, but in one way the dangers are even more pronounced for mature minors. These young women are by definition dependent on their parents and therefore particularly vulnerable to the fear of parental abuse or coercion.

The most detrimental burden of a statute without a mandatory mature minor bypass would be the risk of physical harm to the minor by a parent. There is no doubt that child abuse is a pervasive problem in our society. See Council on Ethical and Judicial Affairs, American Medical Assoc., Mandatory Parental Consent to Abortion, 269 JAMA 82 (1993) (noting that there are about 1.5 million cases of child abuse every year in the United States). The Supreme Court itself recognizes a strong relationship between spousal abuse and child abuse. See Casey 505 U.S. at 891. One study, which is in our record, reveals that six percent of those minors who did not tell their parents about their pregnancy and abortion feared that they would be beaten if their parents found out. Yet the majority never acknowledges the possibility that a parent may abuse a child who reveals that she is considering an abortion.[3]

While the Virginia statute does provide an exception for abused minors who meet certain criteria, these statutory requirements do not address the concerns of most young women who may be exposed to abuse. The Virginia statute only provides an exception for those cases where (1) the minor declares that she is abused and (2) the physician "has reason to suspect" that she is telling the truth and (3) the physician reports the abuse to the authorities. See Va. Code § 16.1-241(V). This procedure will not catch many of the cases where a parent might

_____

[3] The case of Spring Adams, a young woman of 13 from Idaho, illustrates that this possibility is all too real. Adams became pregnant after being repeatedly raped by her father. When he found out that she was about to get an abortion, he shot and killed her. See Margie Boule, An American Tragedy, Portland Oregonian, Aug. 27, 1989.

70

resort to physical abuse to dissuade a minor daughter from seeking an abortion. Child abuse, like spousal abuse, is shrouded in secrecy, and an abused young woman will be very reluctant to reveal her plight to a doctor she has just met. Cf. Casey, 505 U.S. at 889-90. Further, the statute's requirement that a minor must have already experienced abuse completely misses those cases in which revelation of a pregnancy might provoke an abusive situation that did not previously exist. See id. at 889; Mandatory Parental Consent, supra. Even worse, this provision places full power and discretion over the minor's constitutional rights in the hands of a third party, the physician, who would wield an effective veto over his patient's abortion choice by his sole and unreviewable determination that a declaration of abuse is not credible. This is exactly the kind of third-party veto that the Court has flatly rejected as a violation of a minor's constitutional rights. See Danforth, 428 U.S. at 74. I therefore believe that the statute's abuse exception is constitutionally inadequate to protect mature minors who are in danger of physical abuse if they notify their parents about their wish to have an abortion.

Beyond physical abuse, some mature minors, like some of the adult women in Casey, will also be subject to serious psychological abuse or intimidation that would pose a substantial obstacle to their right to seek an abortion. In response to being forced to notify their parents about their intended abortion, some young women will be exposed to severe punishment short of actual battery. This punishment could include parents forcing the young women to leave the family home or denying them financial support. Data in the record show that eighteen percent of minors who declined to inform their parents did so because they feared being evicted from their homes. If anything, the potential consequences of such psychological abuse or intimidation are more severe for minor women, even mature minors, than for adult women because of their obvious dependence on their parents for support. This fact was recognized by the Supreme Court in Bellotti II: "[y]oung pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court." 443 U.S. at 647 (plurality opinion). Psychological abuse and intimidation pose substantial obstacles to a mature minor's right to an abortion just as surely as does physical abuse. Again, the majority never considers that forcing young women to tell

71

their parents that they wish to receive an abortion could have such harmful effects.

These consequences illustrate that parental notification without a mandatory bypass for mature minors permits parents to place much more significant (and harmful) obstacles than mere moral suasion in the path of young women's constitutional right to an abortion. The empirical evidence advanced by the plaintiffs demonstrates that the danger of parental retaliation, like that of spousal abuse, would likely dissuade a large fraction of mature minors -- forced against their will to notify their parents -- from exercising their right to an abortion. A parental notice statute without a mandatory judicial bypass, like the spousal notification provision overturned in Casey, would allow parents to resort to physical and psychological coercion, thereby placing a substantial roadblock in the path of mature young women who seek an abortion. This type of statute, which denies a mature minor sure recourse to the courts, is "tantamount to the veto found unconstitutional in Danforth." Casey, 505 U.S. at 897 (discussing spousal notification statute). Since such a statute creates an undue burden on the constitutional rights of mature young women, it is unconstitutional. I would therefore join every other circuit considering the issue and hold that parental notice statutes must contain a mandatory judicial bypass for mature minors.

III.

The majority suggests that if a mandatory bypass is a constitutional necessity for the mature minor, the Virginia statute "could reasonably be interpreted to require notice bypass for mature minors." Ante at 52. The majority, however, does not hold that "may" has to be read as "must" in the bypass language of the Act. I would so hold.

The Virginia Supreme Court has in the past interpreted "may" to carry a mandatory rather than permissive meaning. In Harper v. Virginia Dept. of Taxation, 462 S.E.2d 892 (Va. 1995), for instance, the Virginia Supreme Court interpreted the term "may" in a statute to be mandatory, even though the word "shall" appeared elsewhere within the same statute, because a mandatory meaning accorded with the clear intent of the legislature. See id. at 895, 898; see also Whitlock v. Hawkins, 53 S.E. 401, 408 (Va. 1906) ("[w]here a statute can be

72

construed in harmony with the fundamental law, the courts will adopt that construction, rather than one which will render the law void"); see generally 17 Michie's Jurisprudence of Virginia & West Virginia, Statutes § 56 ("[I]f . . . an act is susceptible of two constructions, one of which would make the same invalid as in violation of the . . . federal constitution[ ] and the other give validity to the act, the latter interpretation will be adopted" (footnote omitted)). In this case Virginia concedes that if a parental notification statute must constitutionally provide a mandatory judicial bypass for mature minors, "`may' must be given a mandatory meaning." Appellant's Br. at 32.**4**

Construing the Virginia Parental Notice Act to read "may" as mandatory will require Virginia courts to authorize abortions for every minor found to be mature. There is no question that the Virginia parental notice statute thus construed would be constitutional. See Akron II, 497 U.S. at 510-13 (holding statute which provided mandatory bypass for mature minors constitutional). Accordingly, I concur in the judgment that the Virginia Parental Notice Act is constitutional on its face because the term "may" must be interpreted to be mandatory.

IV.

A quarter century ago in Roe v. Wade, 410 U.S. 173 (1973), the Supreme Court firmly established that women have the fundamental constitutional right to choose an abortion. Roe v. Wade has been under constant assault ever since. It has been inveighed against, campaigned against, legislated against, and litigated against. But it is still on the books, and one thing remains clear: a state law cannot place an undue burden on a woman's right to have an abortion. I think it inescapable that forcing parental notification without mandatory bypass on mature women under eighteen would be an undue burden on this right. Thus, when all is said and done, I believe the Supreme Court will uphold the right of mature minors to choose an abortion without parental notification.

_____

**4** I am also persuaded by Judge Widener's statement that under Virginia law, any court that denied permission for an abortion to a mature minor would commit reversible error. See ante at 61 (Widener, J., concurring).

Judge Murnaghan, Judge Ervin, and Judge Motz join in this opinion.